[No. B218515. Second Dist., Div. Two. July 20, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT CANIZALEZ et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Under California Rules of Court, rules 8.1100 and 8.1110, only the introduction paragraphs, Facts, parts I. and V. of the Discussion, and the Disposition are certified for publication.

834

COUNSEL

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Robert Canizalez.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Martin Morones.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lawrence M. Daniels, Joseph P. Lee and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ASHMANN-GERST, J.**—Robert Canizalez (Canizalez) and Martin Morones (Morones) (collectively appellants) appeal from the judgments entered upon their convictions by jury of three counts of second degree murder (Pen. Code, § 187, subd. (a); counts 1–3)[1] and three counts of vehicular manslaughter (§ 192, subd. (c)(1); counts 5–7). Canizalez also appeals from his conviction of dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 4). The jury found to be true as to counts 1 through 3 the allegation that appellants had personally inflicted great bodily injury (§ 1203.075, subd. (a)). The trial court sentenced Canizalez and Morones to prison terms of 48 years to life and 45 years to life, respectively.

Appellants contend that (1) there is insufficient evidence to sustain their second degree murder convictions, (2) the trial court erred in admitting gruesome and inflammatory evidence regarding the victims' deaths, (3) appellants were deprived of their Sixth and Fourteenth Amendment rights to confrontation and cross-examination, when a medical examiner testified from reports regarding two autopsies he did not perform, and (4) the cumulative effect of the errors was prejudicial, requiring reversal. Morones further contends that (5) the trial court abused its discretion by permitting the prosecutor to introduce a photograph of the deceased victims while alive, (6) the trial court erred in instructing the jury in accordance with CALCRIM former No. 400, which erroneously required that an aider and abettor be found "equally guilty" with the direct perpetrator, (7) the trial court erred in instructing the jury in accordance with CALCRIM No. 403, which, as given, only states that the jury could find appellants guilty of murder as aiders and abettors under the natural and probable consequences theory, not that it could

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

find them guilty of vehicular manslaughter, and (8) the trial court erred in refusing to give a pinpoint instruction on the relationship between implied malice and natural and probable consequences of aiding and abetting. Canizalez further contends that (9) the trial court abused its discretion and deprived him of due process and a fair trial by allowing evidence of prior acts of bad driving, (10) he suffered ineffective assistance of counsel by reason of his attorney's failure to (a) seek to exclude the hearsay testimony of the medical examiner, and (b) seek to exclude the medical examiner's testimony regarding the horrific and gruesome details of the injuries to the victims, and (11) CALCRIM No. 403 was erroneous because appellant could not be convicted of murder as the natural and probable consequence of aiding and abetting a misdemeanor.

Each appellant joins in the contentions of the other, as applicable. (Cal. Rules of Court, rule 8.200(a)(5); see *People v. Stone* (1981) 117 Cal.App.3d 15, 19, fn. 5 [172 Cal.Rptr. 445].)

We affirm.

## FACTS

### Background

In October 2007, Dora Groce (Dora) resided at Brookside Mobile Home Park (Brookside) in El Monte with her husband and their two children, eight-year-old Robert and four-year-old Katherine. Brookside had approximately 500 units and only one entrance and exit, which was on Elliott Avenue, east of Parkway Drive. Proceeding east on Elliott Avenue across Parkway Drive led directly into Brookside. Dora drove a 2002 Nissan Altima (Altima).

The intersection of Parkway Drive and Klingerman Street was a quarter of a mile south of the intersection of Parkway Drive and Elliott Avenue. Both intersections had four-way stop signs. The posted speed limit on Parkway Drive was 30 miles per hour. Mountain View High School was in the area.

### The crash

On October 8, 2007, between 5:00 and 5:30 p.m., Canizalez driving a red Mustang and Morones driving a brown Honda north on Parkway Drive, at Klingerman Street, stopped side by side. They exchanged words, their tires screeched and they raced side by side on Parkway Drive, attaining speeds up to 87 miles per hour.

According to two witnesses, German Uruena (German) and his son Victor Uruena (Victor), the Honda took the lead. At that time, Dora was proceeding from Brookside into the intersection of Elliott Avenue and Parkway Drive in her Altima. The Mustang and Honda ran through the four-way stop sign at that intersection, the Honda hitting the rear of the Altima and then the Mustang hitting the front.[2] The Altima was pushed into a green truck driven by Miguel Robles (Robles) and burst into flames. The truck was turned 180 degrees. The Honda hit a red Nissan Sentra driven by Marivel Villagrana (Villagrana), who was in her car parked on Parkway Drive, a few houses north of Elliott Avenue. Villagrana's Sentra then hit a red Camaro in front of it.

### The fatalities

Los Angeles County Fire Captain Henry Rodriguez responded to the accident scene, where he saw the Altima "totally involved with fire." Black smoke and flames were inside the car, with a burning woman visible in the front seat. ". . . [V]oices of children screaming" were coming from the back of the car. The flames and intense heat made it difficult to break the windows and impossible to free the occupants. When the fire was extinguished, three bodies were found inside the car. The two in the rear had their arms stretched out as if reaching for each other. The victims were later identified as Dora, Katherine and Robert.

### Appellants flee the scene

After the collision, Canizalez got out of his Mustang, walked to the Honda and helped Morones and a few other men push the Honda into Brookside. Gilbert Canizalez (Gilbert), Canizalez's brother, lived with his family at Brookside. At approximately 5:30 p.m., he saw Canizalez running toward their home shaking, with a cut on his arm. Canizalez first told him that he had been in a fight. When Gilbert said he did not believe his brother, Canizalez told him that he was racing Morones, had just crashed, lost consciousness and woke up when he smelled smoke. Gilbert drove him back to the accident scene to get medical assistance from an ambulance. Gilbert admitted to detectives that Canizalez told him that he and Morones had been drinking beer before the crash.[3]

El Monte Police Sergeant Richard Williams was the first responder to the accident scene and learned that "somebody . . . had been pushing one of the

---

[2] Another witness was unable to tell if one or both cars hit the Altima.

[3] In a taped telephone conversation between Canizalez and his father, Canizalez told his father to tell Gilbert to say that the detective had intimidated Gilbert. Gilbert was later convicted of being an accessory after the fact for helping to push the Honda away from the scene of the accident.

cars that was involved in the accident." He located the car, parked in a space 50 to 75 yards from the entrance to Brookside. He contacted Marvin Morones (Marvin), Morones's brother, and asked him who had been driving the car. Initially, Marvin said that he did not know, but that it belonged to his father. After Sergeant Williams showed the Honda to Marvin, Marvin admitted it belonged to Morones. Morones fled to Mexico but was later deported back to the United States.

### Canizalez's accident-scene statements

When Canizalez returned to the accident scene, Victor heard him tell a firefighter that the Mustang was not his car but that it had been stolen and was being driven by someone else. Victor told Canizalez not to lie because Victor had seen him jump from the Mustang, do nothing to help the victims and help move the Honda. Canizalez responded, "I know where you live. I know where you go to school, and I'll kill you." A firefighter stepped between them.

Robles heard Canizalez admit to a paramedic that he was driving the Mustang. Robles interjected that Canizalez was racing, which Canizalez denied, claiming he was not racing and that it was an accident.

Gerardo Romero (Romero), a bystander, also heard Canizalez say that he was the driver of the red Mustang. Romero also heard him say, "[L]ook at [my] car. [I] crashed [my] car. [My] car is fucked up." Romero and Canizalez's friends told him to be quiet "there's kids in that vehicle." Canizalez responded, "I don't give a fuck about those kids. I give a fuck—look at my car. I don't give a fuck about those kids."

### The investigation

Irwindale Police Officer John Fraijo, a former mechanic and street racer, testified that he inspected the Honda and Mustang, which was known for being a fast car. The tread wear on the Mustang's driver's side rear tire was consistent with rapid acceleration, and the rims and tires were larger than standard. He was unable to determine if there were any engine modifications due to the extensive front-end and fire damage. The Honda, on the other hand, had been lowered "by changing out the coil springs," the diameter of its rims had been changed to lower its height and increase its maneuverability at high speeds, it had an illegally modified air intake system, its catalytic converter had been removed, and there had been "modification of the headers," part of the exhaust system. These modifications increased horse-power and speed.

Fontana Police Captain Dave Faulkner, a traffic collision reconstruction expert, reviewed the investigation file, including diagrams, police reports and

photographs, went to the scene and took photographs, and inspected the involved cars. He calculated that the minimum highest potential speed of the Mustang was 77 miles per hour, and could have been as high as 87 miles per hour, and of the Honda was 80 miles per hour, and could have been as high as 86 miles per hour. Based upon damage to the two vehicles, Captain Faulkner believed that, at some point, they had hit each other.

In his report, Captain Faulkner stated that the primary collision factor was attributed to the driver of the Mustang because it was "his impact and his cause that was the direct result of your party's death." "[T]he Vehicle Code and the California reporting system that deals with traffic collision requires [*sic*] you to pick the one cause." However, he nonetheless opined that both drivers shared the cause of the collision. It was caused by the running of the stop sign by the two cars and their unsafe speed. While he believed that the Honda did not hit the Altima, because there was so much damage from the fire to the back and side of the Altima, "[t]here was no way to tell."

*Canizalez's prior dangerous driving*

Earlier in the day of the accident, Araceli Mata (Mata) and Jennifer Castro (Castro) saw the red Mustang. Mata was driving north on Parkway Drive when she saw the Mustang driving south at a high rate of speed, near Mountain View High School. She pulled over because the Mustang approached "very fast." As it approached the stop sign, it braked very hard, and Mata heard the screeching of the tires, as it stopped behind another car. Mata later recognized the Mustang involved in the collision as the one she had seen, but she could not identify its driver.

Castro was driving south on Parkway Drive when she saw a red Mustang in front of her and another car in front of it, stopped at the stop sign at Elliott Avenue. Castro heard and smelled the burning of the Mustang's rear tires as she waited and rolled her windows up due to the smoke. After the first car moved, the Mustang made a U-turn and almost struck Castro's driver's side. Castro made eye contact with appellant, who was driving, and said to herself, "You could kill somebody doing this."[4] From its shiny rims, she later identified the Mustang involved in the accident as the same Mustang. She identified Canizalez in a photographic six-pack.

---

[4] The record also states that Castro told Canizalez, "You could kill somebody doing this act."

## DISCUSSION

I. *Sufficiency of the evidence*

A. *Contention*

Appellants contend that there is insufficient evidence to sustain their murder convictions. They argue that neither direct perpetrator with implied malice culpability nor aider and abettor culpability based upon the natural and probable consequences theory was established. There was no implied malice "because there was absolutely no evidence introduced on [appellants'] subjective [mental] appreciation of the risk." Simply because "the end result of the race proved to be dangerous to human life cannot serve to satisfy the element of intent . . . ." Appellants further argue that murder is not the natural and probable consequence of engaging in a speed contest, because "[i]f it were probable, or likely to occur, . . . then every act of engaging in a street race would be tantamount to an act of attempted murder, which it certainly is not." This contention is meritless.

B. *Standard of review*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].) All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358 [43 Cal.Rptr.2d 135].) Reversal on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' (*People v. Bolin, supra,* at p. 331.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

C. *Direct perpetrator theory of culpability*

The prosecution argued and tried the murder charges on both a direct perpetrator with implied malice theory and on an aider and abettor based on the natural and probable consequences theory. With respect to the direct perpetrator theory, appellants argue that their murder convictions are unsupported by the evidence because there was insufficient evidence of implied malice. Morones adds that, as to him, there was insufficient evidence that he caused the victims' deaths, as Canizalez's car, not Morones's, hit the victims' vehicle.

### 1. *Murder with implied malice*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. It is express when the defendant manifests "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188; see *People v. Dellinger* (1989) 49 Cal.3d 1212, 1217 [264 Cal.Rptr. 841, 783 P.2d 200].) Malice should be implied when " ' "the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Dellinger*, at p. 1218.) Implied malice requires that the defendant act with a wanton disregard for the high probability of death (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46, fn. 4 [51 Cal.Rptr.2d 185]), thereby requiring a *subjective awareness* of a high degree of risk (*People v. Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279]). It is not enough that a *reasonable person* would have been aware of the risk. (*Id.* at pp. 296–297.) Malice may be inferred from the circumstances of the murder. (*People v. Harmon* (1973) 33 Cal.App.3d 308, 311 [108 Cal.Rptr. 43].)

Appellants do not dispute that they were speeding, participated in a street race, and were guilty of vehicular manslaughter. Rather, ignoring a tsunami of contrary circumstantial evidence, they argue that there is insufficient evidence they acted with conscious disregard for life because there is no evidence they were aware of the risk involved in their conduct. They are wrong. That evidence is overwhelming.

Appellants were fully aware of the conditions at the accident scene which would make racing there dangerous. They had long resided at Brookside, within yards of where the fatal crash took place, and inferentially knew the residential nature of the neighborhood, the traffic conditions, caused in part by cars entering and exiting the only exit from the 500-unit Brookside Mobile Home Park onto Elliott Avenue, the presence of a four-way stop sign at Elliott Avenue and Parkway Drive, and the presence nearby of Mountain View High School.

Canizalez was seen driving recklessly in the area just hours before the collision. Castro saw Canizalez's red Mustang heading south on Parkway Drive, stopping at a stop sign at the intersection of Elliott Avenue, where the fatal accident later occurred, burning the Mustang's rear tires and making a precipitous U-turn, almost striking Castro's car. Castro commented, "You could kill somebody doing this." In a second incident that day, Mata saw the

red Mustang speeding south on Parkway Drive and being forced to brake very hard at a stop sign, with its tires screeching, in order to stop behind another car. This alerted Canizalez that speeding made stopping difficult and created a dangerous condition.

Appellants' street race was not an isolated, spur-of-the-moment instance of poor judgment. It appears that the Mustang and Honda had been modified to engage in such races, and presumably appellants had done so in the past. Morones's Honda had been illegally "hopped up" so that it had more power and could go faster. It had been lowered "by changing out the coil springs," the diameter of its rims had been increased to lower its height and increase its maneuverability at high speeds, it had an illegally modified air intake system, its catalytic converter had been removed, and there had been "modification of the headers," part of the exhaust system. While the Mustang was too damaged from the collision and fire to allow an analysis of modifications to its engine, the tires and rims were not standard and the wear on the back tire indicated that it had been frequently subject to rapid acceleration.

Before their speed contest, appellants consumed beer and then raced their cars, side by side, on a residential street, reaching speeds of up to 80 to 87 miles per hour, 50 to 60 miles above the speed limit. They ran through a stop sign, which they must have known was there, living just yards away and Canizalez having stopped there just hours earlier, crashing into the Altima and other cars. While a dangerous act may be insufficient by itself to establish that the actor had subjective knowledge of the risk, in situations such as this, it is a relevant consideration.[5] As stated by Justice Gilbert in *People v. Moore* (2010) 187 Cal.App.4th 937, 941 [114 Cal.Rptr.3d 540] (*Moore*): "Whether Moore was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk."

Echoing this same sentiment here, the trial court aptly pointed out, "[T]hey're engaged in a speed contest—at 80 or 90 miles per hour. How much more knowledge do they need? They've got a thousand—several thousand-pound vehicle that they're running at 70, 80 miles per hour. I mean, what does it take for a person to understand that what they're doing is inherently dangerous to human life?"

---

[5] Morones argues that relying upon appellants' dangerous conduct in determining whether they had subjective knowledge of the danger their conduct created "would impose an improper 'reasonable man' objective standard for the proper subjective test." (See *People v. Watson, supra,* 30 Cal.3d at pp. 296–297.) While this argument has appeal, it does not preclude drawing an inference of subjective awareness of the grave risk when the risk created is extremely high, which inference can be considered along with other circumstantial evidence to support a finding of subjective knowledge.

Appellants' callous disregard for the safety of others was no more evident than by their conduct after the crash. With Dora and her two children being incinerated in the Altima, appellants showed no remorse or concern. They made no effort to help the victims or even inquire about their condition. Rather, they tried to remove the evidence by pushing the Honda into Brookside. Morones fled to Mexico. Canizalez went to his residence and lied to his brother about the incident and then went back to the accident scene only for the purpose of receiving medical attention. There, he initially denied driving the Mustang and later that he was speeding. Canizalez was heard saying, "[L]ook at his car. [I] crashed [my] car. [My] car is fucked up," and, "I don't give a fuck about those kids. I give a fuck—look at my car. I don't give a fuck about those kids."

This mountain of circumstantial evidence overwhelmingly establishes appellants' subjective awareness of the risk of death that their racing created and their callous indifference to its consequences.

*Moore* is instructive. In that case, the defendant drove through city streets at excessive speed. He passed one victim going 80 to 90 miles per hour in a 35-mile-per-hour zone. He ran a red light and collided with another car which in turn hit a third car, causing the death of one victim and serious injury to another. The defendant did not get out of his car and check on the victims but continued to drive. When arrested, he claimed that he did not intend to kill anyone and did not experience any mechanical failure, but was simply going too fast. He said that he had no problem leaving the accident scene because the victims were dead. He was going home " 'to clean up, probably have a beer, sit down, sit at home and watch television.' " (*Moore, supra,* 187 Cal.App.4th at p. 940.)

On appeal, like appellants here, the defendant conceded that the evidence was sufficient to support a finding of gross vehicular negligence but claimed it was insufficient to show that he had a subjective awareness of the risk for manslaughter. Justice Gilbert rejected this claim stating: "Here Moore drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes. His actions went well beyond gross negligence. He acted with wanton disregard of the near certainty that someone would be killed." (*Moore, supra,* 187 Cal.App.4th at p. 941.)

## 2. *Causation*

Morones argues that in any event he cannot be liable for murder as a direct perpetrator because there is no credible evidence that his Honda hit the

Altima. He argues that, "[T]he weight of the credible evidence supports the conclusion that [Morones's] vehicle passed behind the Altima and impacted Villagrana's car." Only German and Victor testified that he was the first to hit the back of the Altima, but they were 300 to 400 feet away. In opening statement, the prosecutor told the jury that Morones did not strike the Altima and was not involved in that collision but struck another vehicle. The accident reconstruction expert, Captain Faulkner, testified that the cause of the accident was Canizalez's failure to stop at the stop sign, not the racing. Morones's contention lacks merit.

It was for the jury, not us, to determine the weight to be given to the testimony of German and Victor, as compared to the testimony on which Morones relies. We simply assess whether there was sufficient evidence to support the jury's verdict. There was sufficient evidence here for the jury to find that Morones's Honda hit the Altima. German and Victor, who actually saw the accident, both testified that the Honda was the first car to hit the Altima. Captain Faulkner testified that "there was no way to tell" if the Honda hit the Altima. The testimony of a single witness is sufficient to support a conviction. (*People v. Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123] ["The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable."].)

But, even if the jury concluded that Morones's car did not hit the Altima, the evidence was still sufficient to support a finding that he caused the victims' deaths. It is proximate causation, not direct or actual causation, which together with the requisite mental state determines the defendant's liability for murder. (*People v. Sanchez* (2001) 26 Cal.4th 834, 845 [111 Cal.Rptr.2d 129, 29 P.3d 209] (*Sanchez*).) Just because the actual cause of death cannot be determined does not undermine a first degree murder conviction. (*Ibid.*) There may be multiple proximate causes even where there is but one actual cause. (*Id.* at p. 846.) The People's burden of proving causation is met if evidence is produced from which it may be reasonably inferred that the defendant's act was a substantial factor in producing the result of the crime. (*People v. Scola* (1976) 56 Cal.App.3d 723, 726 [128 Cal.Rptr. 477] (*Scola*), cited with approval in *People v. Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274].) The prosecution does not have to prove to a mathematical certainty that the killing would not have occurred absent the defendant's act. (*Scola, supra,* at p. 727.)

The analysis in *People v. Kemp* (1957) 150 Cal.App.2d 654 [310 P.2d 680] (*Kemp*), another speed contest case, cited with approval by our Supreme Court in *Sanchez, supra,* 26 Cal.4th at page 846, is applicable here. Kemp and Coffin engaged in a car race down a public street, resulting in the death

of a person driving a car hit by Coffin's car. Kemp, as Morones does here, "contended that there was no showing of anything attributable to him which was a proximate cause of the death." (*Kemp, supra,* at p. 658.) He argued that the mere violation of the Vehicle Code section precluding speed contests could not constitute a proximate cause of death because the death was caused by either the excessive speed or reckless driving of Coffin. The Court of Appeal disagreed stating, "The evidence here strongly indicates that Kemp and Coffin were inciting and encouraging one another to drive at a fast and reckless rate of speed on a residence street and as they closely approached a blind intersection. It was by the merest chance that Kemp was able to avoid hitting the other car, and that Coffin was not. Only the matter of a split second and a few inches made the difference. They were both violating several laws, *the acts of both led directly to and were a proximate cause of the result,* and the fact that the appellant happened to narrowly escape the actual collision is not the controlling element. The evidence is sufficient to show that they were not acting independently of each other, and that they were jointly engaged in a series of acts which led directly to the collision." (*Kemp, supra,* at p. 659.)

Canizalez and Morones were similarly jointly engaged in a speed race that led directly to the fatal collision and deaths. Captain Faulkner testified that the cause of the accident was the running of the stop sign *by the Honda and the Mustang* and *their unsafe speed* and that both drivers were responsible. Officer Darrell Carter concluded in a report that the primary cause of the collision was street racing. The evidence amply supports that Morones's actions were a proximate cause of the victims' deaths and that appellants were coperpetrators in the crimes. (See *People v. Thompson* (2010) 49 Cal.4th 79, 118 [109 Cal.Rptr.3d 549, 231 P.3d 289].)

### D. *Aiding and abetting on natural and probable consequences theory*

Because we conclude that there is sufficient evidence to support both appellants' second degree murder convictions based upon their direct actions with implied malice, we need not consider whether there was also sufficient evidence to support aider and abettor liability on the natural and probable consequences theory.

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 832.

## V. *Instructional error*

### A. *CALCRIM Nos. 400 and 403*

#### 1. *Background*

The prosecutor argued the alternative theories that appellants were guilty of murder either as direct perpetrators on an implied malice theory or as aiders and abettors on a natural and probable consequences theory. There was conflicting evidence as to which appellant's car actually struck the Altima. Consequently, the jury instructions did not specify which appellant was theorized to be the direct perpetrator and which the aider and abettor.

The trial court instructed the jury regarding the relationship between being a direct perpetrator and aider and abettor in accordance with the 2009 version of CALCRIM No. 400, as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."[14] (Italics added.) During closing argument, the prosecutor argued that, "A person is equally guilty of the crime whether he committed it as a perpetrator or as an aider and abettor."

The trial court also instructed the jury regarding the natural and probable consequences doctrine of aiding and abetting in accordance with CALCRIM No. 403. It informed the jury that it could convict appellants of the nontarget offense of murder if a reasonable person in their position would have known that commission of a murder was the natural and probable consequence of engaging in a speed contest. The jury was not instructed that it could also find appellants guilty of the less serious vehicular manslaughter as a nontarget offense under the natural and probable consequences doctrine.[15]

---

[14] The 2010 version of CALCRIM No. 400 stated in the last sentence of the first paragraph that "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator . . . ," deleting the word "equally" found in the 2009 version.

[15] CALCRIM No. 403, as given, provides in its entirety: "Before you may decide whether a defendant is guilty of murder based on aiding and abetting, you must decide whether he is guilty of engaging in a speed contest. [¶] To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. A defendant is guilty of engaging in a speed contest; [¶] 2. During the commission of engaging in a speed contest, a coparticipant in that speed contest committed the crime of murder; AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the crime of

During the jury instruction conference, neither appellant objected to, nor requested clarification or modification of, CALCRIM No. 400 or 403. However, after the prosecutor had concluded her opening argument to the jury, Canizalez, joined by Morones, objected that the prosecutor had applied the natural and probable consequences doctrine in her closing argument, denying Canizalez of his Fifth, Sixth, Eighth and Fourteenth Amendment rights because "the jury must find that the perpetrator possessed the required specific intent or mens rea for the crime itself and that natural and probable consequences doctrine lessens the burden." Murder requires implied malice, that is, that the perpetrator actually knows that the act is dangerous to human life, while the natural and probable consequences doctrine only requires that a reasonable person foresee that the nontarget offense is a natural consequence of the target offense. Canizalez argued that it amounted to a "judicially-created misdemeanor murder rule." During this argument, Canizalez did not specifically refer to CALCRIM No. 400 or 403.

### 2. *Contentions*

Morones contends that the trial court erred in instructing the jury in accordance with the 2009 version of CALCRIM No. 400 in tandem with CALCRIM No. 403. He argues that CALCRIM former No. 400 told the jury that an aider and abettor is "equally guilty" as the direct perpetrator and failed to tell the jury that an aider and abettor can be convicted of a less serious offense than that of which the direct perpetrator is convicted. CALCRIM No. 403 told the jury that it could find appellants guilty of murder under the natural and probable consequences doctrine, but did not tell it that it also had the option of finding him guilty of the less serious vehicular manslaughter under that doctrine. He claims that "where only the non-target offense of murder was specified [in CALCRIM No. 403], a reasonable jury would believe that it could not convict of the less serious vehicular manslaughter based upon natural and probable consequences aiding and abetting. . . . Without the option of vehicular manslaughter, the murder verdict was directed by the 'equally guilty' language."

Canizalez contends that CALCRIM No. 403 is contrary to law because it allows a defendant to be convicted of murder as a natural and probable

---

murder was a natural and probable consequence of engaging in a speed contest. [¶] A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. [¶] A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the speed contest, then the commission of murder was not a natural and probable consequence of the speed contest. [¶] To decide whether the crime of engaging in a speed contest was committed, please refer to the separate instructions that I will give you on that crime."

consequence of committing a mere misdemeanor. "One who does no more than aid and abet a misdemeanor does not possess malice aforethought. On the other hand, the Legislature has spoken on the liability of one who commits a misdemeanor which results in a homicide; he is guilty only of involuntary manslaughter."

The People contend that Morones forfeited his claims by failing to ask the trial court to modify or clarify CALCRIM No. 400 and/or 403. We agree.

### 3. *Forfeiture*

Generally, " ' "[a] party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [91 Cal.Rptr.3d 874], italics added (*Samaniego*); see also *People v. Hart* (1999) 20 Cal.4th 546, 622 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1134 [40 Cal.Rptr.3d 118, 129 P.3d 321].) We must therefore first determine whether CALCRIM Nos. 400 and 403, as given here, are correct in law, in order to decide whether appellants were obligated to request clarification in order to preserve their challenges to those instructions on appeal.

CALCRIM Nos. 400 and 403 are correct in law. As we said in *Samaniego*, the statement in CALCRIM former No. 400 that an aider and abettor is "equally guilty" with the direct perpetrator of the target crime "is generally an accurate statement of law." (*Samaniego, supra,* 172 Cal.App.4th at p. 1163.) Thus, to the extent Morones believed that the instruction was inaccurate in the facts presented in this case, he was obliged to object to it or to request clarification or modification, which he failed to do. He has therefore forfeited his claim as to CALCRIM No. 400.

Similarly, Morones has forfeited his claim regarding CALCRIM No. 403, which is also correct in law. As discussed in part V.A.5., *post,* that instruction accurately states that an aider and abettor can be guilty of murder under the natural and probable consequences doctrine, if a reasonable person in his or her position would have known that murder was a natural and probable consequence of a speed contest. The instruction's failure to state that the aider and abettor could also be guilty of vehicular manslaughter on the natural and probable consequences theory made the instruction, at most, incomplete in the context of this case, not incorrect. Therefore, Morones was required to request clarification or modification of this instruction to add that appellants could alternatively be guilty of involuntary manslaughter as a natural and probable consequence of the target offense. Having failed to do so, he forfeited this contention as to CALCRIM No. 403.

But even if these contentions had been preserved for appeal, we would nonetheless find that they did not result in prejudicial error.

### 4. *Morones's challenge to CALCRIM Nos. 400 and 403*

■ In criminal cases " '[a] trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." ' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824 [89 Cal.Rptr.3d 225, 200 P.3d 847]; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*).) We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111 [93 Cal.Rptr.2d 433].)

As previously stated, appellants' guilt was premised upon one of two alternative theories: (1) they were both direct coperpetrators, or (2) one was the perpetrator and the other was culpable as an aider and abettor under the natural and probable consequences doctrine.[16] We conclude that under either theory, the statement in the 2009 version of CALCRIM No. 400, that appellants are "equally guilty" as the direct perpetrator is correct.

#### a. *Direct perpetrator culpability*

As we concluded in part I.C., *ante,* there was not only sufficient, but overwhelming, evidence to support a jury finding that both appellants were guilty of second degree murder as joint, direct perpetrators of the deaths of Dora and her children. As joint perpetrators they were "equally guilty" of the charged offense.

#### b. *Aider and abettor culpability*

■ If the jury found either appellant guilty only as an aider and abettor under the natural and probable consequences doctrine, the "equally guilty" statement is also correct.[17] "[U]nder the general principles of aiding and abetting, 'an aider and abettor [must] act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing,

---

[16] The only theory of aider and abettor culpability argued by the prosecutor was the natural and probable consequences doctrine because there was no evidence appellants intended to aid and abet commission of the murders, only that they intended to aid and abet in the speed contest.

[17] It is clear under the evidence that if anyone was an aider and abettor rather than a perpetrator, it would be Morones. The weight of the evidence is that either his car did not hit the Altima, or if it did, it was Canizalez's impact with the Altima that inflicted the deadly damage.

or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 262 [58 Cal.Rptr.2d 827, 926 P.2d 1013], italics omitted (*Prettyman*).) When the offense is a specific intent offense, " ' "the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' " ' " (*Samaniego, supra*, 172 Cal.App.4th at p. 1164.) Consequently, an aider and abettor of the target crime will ordinarily have the same mens rea as the direct perpetrator and be "equally guilty."

However, in some extraordinary circumstances, our Supreme Court has stated that an aider and abettor can be *more* culpable than the direct perpetrator, if the aider and abettor has a more culpable state of mind (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [108 Cal.Rptr.2d 188, 24 P.3d 1210] (*McCoy*)), or, as we have stated, less culpable, if the aider and abettor has a less culpable state of mind (*Samaniego, supra*, 172 Cal.App.4th at p. 1164).

But neither *McCoy* nor *Samaniego* involved the natural and probable consequences doctrine. Each reached its conclusion only for aiders and abettors of a target offense. *McCoy* expressly stated, "Nothing we say in this opinion necessarily applies to an aider and abettor's guilt of an unintended crime under the natural and probable consequences doctrine." (*McCoy, supra*, 25 Cal.4th at p. 1117.) Its analysis was only to apply "when guilt does not depend on the natural and probable consequences doctrine . . . ." (*Id.* at p. 1118.)

■ The natural and probable consequences doctrine provides that: " '[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' [Citation.] Thus, . . . a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*Prettyman, supra*, 14 Cal.4th at p. 261.)

■ Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. (*People v. Garrison* (1989) 47 Cal.3d 746, 778 [254 Cal.Rptr. 257, 765 P.2d 419] [accomplice liability is vicarious].) Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be "equally guilty" with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime.

Consequently, the statement in CALCRIM former No. 400 that "[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it" (italics added), is a correct statement of the law when applied to natural and probable consequences aider and abettor culpability and was properly given in this case.

We need not decide whether CALCRIM No. 403 was erroneous for failing to include vehicular manslaughter as a potential nontarget offense of which appellants could be found guilty under the natural and probable consequences doctrine, for, as discussed below, it is clear that that omission was harmless.

### c. *Harmless error*

Even if the "equally guilty" language in the 2009 version of CALCRIM No. 400 was an incorrect statement of the law, we nonetheless conclude that giving it here was harmless under even the most stringent harmless error standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) As set forth in part I., *ante*, the evidence that Morones and Canizalez were coparticipants in the speed contest and coperpetrators of the victims' deaths is overwhelming. Captain Faulkner opined that both appellants shared the cause of the collision, which was caused by running the stop sign and speeding. It would be virtually impossible to conclude that either one of the appellants was aiding the other, as they were both full and equal participants in the speed contest that resulted in the fatal accident.

Similarly, any error in failing to include vehicular manslaughter as a possible nontarget offense in CALCRIM No. 403 was harmless beyond a reasonable doubt. The jury was separately instructed on the elements of the offenses of murder and vehicular manslaughter. On an aider and abettor theory, one of the appellants had to be the direct perpetrator and the other the aider and abettor. The jury found both appellants guilty of second degree murder. Hence, if it decided the matter on an aider and abettor theory, it had to have found that the direct perpetrator satisfied the required elements for murder. If the direct perpetrator committed murder, as discussed above, the aider and abettor was "equally guilty" of murder under the natural and probable consequences doctrine. Thus, even if manslaughter was included in CALCRIM No. 403, the aider and abettor would be guilty of murder.

In summary, under either the direct perpetrator or the aider and abettor theory, appellants suffered no prejudice from CALCRIM Nos. 400 and 403.

### 5. *Canizalez's challenge to CALCRIM No. 403*

#### a. *Contention*

CALCRIM No. 403 instructed the jury that if it found that one of the appellants committed the misdemeanor of engaging in a speed contest, and the other appellant aided and abetted in the commission of that crime, the aider and abettor could be found guilty of murder under the natural and probable consequences theory. Canizalez contends that that instruction was erroneous because a defendant cannot be convicted of murder as the natural and probable consequence of a misdemeanor. He argues that, " 'Pursuant to our statutory scheme, murder is defined as the unlawful killing of a human being with malice aforethought.' [Citation.] One who does no more than aid and abet a misdemeanor does not possess malice aforethought. On the other hand, the Legislature has spoken on the liability of one who commits a misdemeanor which results in a homicide: he is guilty only of involuntary manslaughter. (Pen. Code, § 192.)" This contention is without merit.

#### b. *Misdemeanor as basis for murder under natural and probable consequences theory*

It is unclear whether there is a blanket prohibition against finding an aider and abettor guilty of murder under the natural and probable consequences doctrine when the target offense is only a misdemeanor. Canizalez argues that a misdemeanor can at most support a voluntary manslaughter conviction under the natural and probable consequences doctrine, citing *People v. Munn* (1884) 65 Cal. 211 [3 P. 650] and *People v. Spring* (1984) 153 Cal.App.3d 1199 [200 Cal.Rptr. 849]. Those cases are inapposite, as neither involves the

natural and probable consequences doctrine. The language in some cases, however, has suggested that a misdemeanor target offense cannot support a natural and probable consequences conviction of murder. (See, i.e., *People v. Huynh* (2002) 99 Cal.App.4th 662, 681 [121 Cal.Rptr.2d 340] [concluding that because target offenses of conspiracy to commit an assault and a battery could be misdemeanors, the trial court should have instructed sua sponte on involuntary manslaughter, a lesser included offense of murder, suggesting that misdemeanor will only support involuntary manslaughter as a natural and probable consequence].)

On the other hand, Morones concedes that "a target misdemeanor may support a conviction for a non-target murder under the [natural and probable consequences] theory." (See *People v. King* (1938) 30 Cal.App.2d 185, 200 [85 P.2d 928] [plan for misdemeanor simple assault resulted in death when one conspirator used a deadly weapon]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 732–733 [64 Cal.Rptr.2d 282] (*Lucas*) [misdemeanor brandishing a gun].) "The natural and probable consequences doctrine . . . allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony." (*People v. Culuko* (2000) 78 Cal.App.4th 307, 322 [92 Cal.Rptr.2d 789].)

We believe that the cases cited by Morones set forth the more logical position. Given that the natural and probable consequences doctrine looks to the reasonable likelihood that the nontarget murder will result from the target offense, it would appear that applying the label "felony" or "misdemeanor" to the target offense is not talismanic in deciding whether the aider and abettor can be convicted of a nontarget murder. The key factor is the ability to anticipate the likelihood that the nontarget offense will result from the target offense. We cannot look to the naked elements of the target crime but must consider the full factual context in which appellants acted. (*Lucas, supra*, 55 Cal.App.4th at p. 733.) The requirement that the nontarget offense be reasonably foreseeable from the nature of the target offense ensures that in most circumstances, aiding and abetting a misdemeanor will not have murder as its natural and probable consequence, but it does not mandate it. Here, given the facts and circumstances of the speed contest, as earlier discussed, the likelihood that someone would be killed was reasonably foreseeable.

However, we need not decide whether a misdemeanor can ever support a murder conviction under the natural and probable consequences doctrine because here the speed contest was a felony.

c. *Speed contest here was not a misdemeanor*

■ Canizalez's contention is based on the faulty premise that engaging in a speed contest is a misdemeanor. In this case, it was a felony. Vehicle Code

section 23109 subdivision (a), provides that "[a] person shall not engage in a motor vehicle speed contest on a highway." Vehicle Code section 360 defines a highway to include a street. Vehicle Code section 23109.1 provides: "(a) A person convicted of engaging in a motor vehicle speed contest in violation of subdivision (a) of Section 23109 that proximately causes one or more of the injuries specified in subdivision (b) to a person other than the driver, shall be punished by imprisonment in the state prison, or by imprisonment in a county jail for not less than 30 days nor more than six months, or by a fine of not less than five hundred dollars ($500) nor more than one thousand dollars ($1,000), or by both that fine and imprisonment. [¶] (b) This section applies to all of the following injuries: [¶] (1) A loss of consciousness. [¶] (2) A concussion. [¶] (3) A bone fracture. [¶] (4) A protracted loss or impairment of function of a bodily member or organ. [¶] (5) A wound requiring extensive suturing. [¶] (6) A serious disfigurement. [¶] (7) Brain injury. [¶] (8) Paralysis."

As these code sections make clear, engaging in a speed contest can be a wobbler if any of the injuries enumerated in Vehicle Code section 23109.1, subdivision (b) occur. The testimony of the medical examiner establishes that many of the specified injuries were suffered by the victims before their deaths. For example, Robert suffered a right elbow fracture and Dora a spinal fracture. (Veh. Code, § 23109.1, subd. (b)(3).) Given the egregious nature of appellants' conduct and the fatal injuries to the victims, the speed contest offense would undoubtedly be considered a felony. Moreover, it is hard to see how it would not be considered an inherently dangerous felony since a vehicle can be considered a dangerous weapon. (See *People v. Wright* (2002) 100 Cal.App.4th 703 [123 Cal.Rptr.2d 494].) Appellants drove at nearly 90 miles per hour, racing side by side on a residential street, not bothering to stop at a stop sign. The risk to the public is manifest.

B. *Failure to give pinpoint instruction*

1. *Background*

The trial court instructed the jury that it had to unanimously agree as to which appellant committed the murder or that both did so.[18] After the

---

[18] The unanimity instruction given was as follows: "During the arguments relating to this instruction, Ladies and Gentlemen, there was some argument that the defendants were allegedly engaged in a speed contest and, two, that during the commission of engaging in that speed contest a co-participant in the speed contest committed the crime of murder. The argument was that the facts could be interpreted to show either defendant had committed murder. What you are going to have to do, you are going to have to decide whether one or both of the defendants committed the crime of murder but you cannot come to a conclusion that six of you believe one defendant did or six of you—and six of you believe the other one did. [¶] In order to have this principle of law apply, you have to be in agreement as to which

instructions were given, Canizalez's attorney argued: ". . . [T]here's nothing in the instructions that requires the jury upon finding, unanimously finding, that one of the two were the perpetrator. That first they must find that the perpetrator had the mental state as is required for the implied malice. Because the instruction on natural and probable consequences and especially the third line of that instruction it reads, quote, to prove that the defendant is guilty of murder, the defendant—the People must prove guilty of engaging in a speed contest; during the commission of engaging in it, a co-participant in that speed contest committed the crime of murder; and, under all circumstances, a reasonable person in the defendant's position would have known that the commission of the crime of murder was a natural and probable consequence."

When the trial court indicated that the commission of the crime would include implied malice, Canizalez's counsel continued: "I appreciate that. But I think that it's vague and I understand it but it takes several readings to understand it and I would submit that the language is vague and confusing and could confuse the jury whereby they could end up theoretically convicting on a charge of murder and not finding the necessary mental intent and it's that failing that I think—it gives me real concern in terms of the due process and the Fifth, Sixth, and Eighth Amendments of the U.S. Constitution."

Morones's counsel joined in the objection.

### 2. *Contention*

Morones contends that the trial court erred in refusing to give a pinpoint instruction relating implied malice to natural and probable consequences aiding and abetting. He argues that "[c]ounsel here had a legitimate concern which could have easily been addressed by a short pinpoint instruction telling the jury that in order to convict the aider and abettor under a natural and probable consequences theory they would first have to find that the direct perpetrator acted with implied malice and that implied malice required that the direct perpetrator have the required mental state of subjective understanding of the risk and conscious regard of it." This contention is without merit.

### 3. *Requested pinpoint instruction redundant*

 "A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142 [124 Cal.Rptr.2d 373, 52 P.3d 572].) Specifically, a criminal defendant "is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable

---

defendant committed murder or both committed murder. You can't be split in your conclusion as to which or both committed murder during the participation in a street speed contest."

doubt . . . ." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230 [14 Cal.Rptr.2d 702, 842 P.2d 1].) But where standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused. (See *People v. Gutierrez, supra*, at p. 1144 ["[T]he standard manslaughter instructions given adequately covered the valid points in the proposed pinpoint manslaughter instructions."].)

Appellants requested a pinpoint instruction telling the jury that it had to find that the perpetrator had the mental state required for implied malice to find him guilty of murder. This instruction was unnecessary because other instructions adequately informed the jury of this point. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99 [17 Cal.Rptr.3d 710, 96 P.3d 30] [a trial court need not give a pinpoint instruction if it merely duplicates other instructions].)

CALCRIM No. 403 informed the jury that to be guilty as an aider and abettor under the natural and probable consequences doctrine, it had to determine that a coparticipant in the speed contest committed the crime of murder and that "a reasonable person in the defendant's position would have known that the commission of the crime of murder was a natural and probable consequence of engaging in a speed contest." It referred the jury to the separate instructions "[t]o decide whether crime of [murder] was committed." CALCRIM No. 520 informed the jury of the elements of murder, which included the need for the prosecution to prove implied malice. The prosecutor argued in closing that the perpetrator had to have implied malice. As a result, instructions that were given adequately informed the jury that the perpetrator of the murder had to have acted with implied malice. The requested pinpoint instruction was therefore redundant, unnecessary and properly rejected.

Morones relies on the decision in *People v. Hart* (2009) 176 Cal.App.4th 662 [97 Cal.Rptr.3d 827] (*Hart*) to support his contention that the trial court erred in failing to give a pinpoint instruction. In *Hart*, the defendant and an accomplice, Rayford, attempted an armed robbery of a liquor store. Hart shot the owner, and he and Rayford were convicted of attempted robbery and premeditated attempted murder. (*Hart, supra*, at p. 666.) The jury was instructed that it could find both men guilty of attempted murder if it found that attempted murder was a natural and probable consequence of the attempted robbery. (*Id.* at p. 669.) On appeal, Rayford argued that the instructions "did not sufficiently instruct the jury concerning the relationship between the natural and probable consequences doctrine and the premeditation and deliberation element of attempted premeditated murder." (*Id.* at p. 668.)

The *Hart* court found the instructions to be insufficient. (*Hart, supra*, 176 Cal.App.4th at p. 673.) The jury was not informed that in order to find the

aider and abettor guilty of attempted premeditated murder, "it was necessary to find that attempted premeditated murder, not just attempted murder, was a natural and probable consequence of the attempted robbery." (*Ibid.*) "The trial court properly instructed the jury concerning premeditation and deliberation, as it relates to attempted murder, stating, in essence, that it is a subjective state of mind. However, in determining whether the premeditation and deliberation element was a natural and probable consequence of the attempted murder, the jury does not look at the aider and abettor's subjective state of mind. Therefore, the general instruction concerning the premeditation and deliberation element of attempted murder did not properly inform the jury concerning its duty with respect to the natural and probable consequences doctrine." (*Ibid.*)

*Hart* is inapposite. There, the instructions erroneously failed to inform the jury that to find the aider and abettor guilty of the nontarget offense of willful and deliberate attempted murder, it had to be instructed that willful and deliberate attempted murder, not just attempted murder, had to be the natural and probable consequence of the target offense. No instruction so informed the jury. Here, on the other hand, the requested instruction did not pertain to the aider and abettor's culpability under the natural and probable consequences doctrine, but that the direct perpetrator had to have acted with implied malice. That information was included in the other instructions.

### 4. *Harmless error*

Any "misdirection of the jury" (Cal. Const., art. VI, § 13), that is instructional error (*Breverman, supra,* 19 Cal.4th at p. 173), cannot be the basis of reversing a conviction unless " 'an examination of the *entire cause, including the evidence,*' " indicates that the error resulted in a " 'miscarriage of justice.' " (*Ibid.*) "Under such circumstances, '[t]he prejudicial effect of such error is to be determined, for purposes of California law, under the generally applicable reasonable-probability test' " in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. (*Breverman, supra,* at p. 174.) Applying that test here, we find the instructional error to be harmless, as the jury was instructed on the requested points.

## VI. *Cumulative Error**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 832.

## DISPOSITION

The judgments are affirmed.

Boren, P. J., and Doi Todd, J., concurred.

Petitions for a rehearing were denied August 18, 2011, and on July 20, 2011, and August 18, 2011, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 2, 2011, S195786. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.