Filed 12/7/21  P. v. Morones CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>MARTIN MORONES,<br><br>          Defendant and Appellant. | B309121<br><br>(Los Angeles County<br>Super. Ct. No. KA080781) |


APPEAL from an order of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Reversed and remanded to the trial court.

Law Offices of Stein and Markus, Andrew M. Stein, Joseph A. Markus, and Brentford Ferreira for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2007, Martin Morones (Morones) and Robert Canizalez[1] (Canizalez) raced their cars in a speed contest that resulted in the death of three people.  In 2009, a jury convicted Morones of three counts of second degree murder (Pen. Code, § 187, subd. (a), counts 1 through 3)[2] and found true the allegations that he personally inflicted great bodily injury (§ 1203.075, subd. (a)).  The jury also convicted Morones of three counts of vehicular manslaughter with gross negligence (§ 192, subd. (c)(1), counts 5 through 7).  He was sentenced to state prison for an aggregate of 45 years to life on counts 1 through 3.  The sentences on counts 5 through 7 were stayed pursuant to section 654.  We affirmed the judgment in *People v. Canizalez* (2011) 197 Cal.App.4th 832.

In 2020, Morones filed a petition for resentencing pursuant to section 1170.95.  After briefing by both sides, the trial court held a section 1170.95, subdivision (c) hearing, determined that Morones had failed to establish a prima facie case of eligibility and denied the petition.  On appeal, Morones argues that the trial court erred by improperly making factual findings.  The Attorney General agrees that the denial must be reversed, affirmatively asserting that appellant alleged facts sufficient to state a prima facie case of eligibility because the record of conviction does not show him to be ineligible as a matter of law.  We reverse and remand the matter to the trial court with directions to issue an order to show cause and hold an evidentiary hearing pursuant to section 1170.95, subdivision (d)(3).

---

[1]     Canizalez is not a party to this appeal.

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

2

**FACTS**

**Evidence in *People v. Canizalez*[3]**

"*Background*

"In October 2007, Dora Groce (Dora) resided at Brookside Mobile Home Park (Brookside) in El Monte with her husband and their two children, eight-year-old Robert and four-year-old Katherine. Brookside had approximately 500 units and only one entrance and exit, which was on Elliott Avenue, east of Parkway Drive. Proceeding east on Elliott Avenue across Parkway Drive led directly into Brookside. Dora drove a 2002 Nissan Altima (Altima).

"The intersection of Parkway Drive and Klingerman Street was a quarter of a mile south of the intersection of Parkway Drive and Elliott Avenue. Both intersections had four-way stop signs. The posted speed limit on Parkway Drive was 30 miles per hour. Mountain View High School was in the area.

"*The crash*

"On October 8, 2007, between 5:00 and 5:30 p.m., Canizalez driving a red Mustang and Morones driving a brown Honda north on Parkway Drive, at Klingerman Street, stopped side by side. They exchanged words, their tires screeched and they raced side by side on Parkway Drive, attaining speeds up to 87 miles per hour.

"According to two witnesses, German Uruena (German) and his son Victor Uruena (Victor), the Honda took the lead. At that time, Dora was proceeding from Brookside into the intersection of Elliott Avenue and Parkway Drive in her Altima. The Mustang and Honda ran through the four-way stop sign at

---

[3]     We borrow certain facts from the published portion of *Canizalez*.

that intersection, the Honda hitting the rear of the Altima and then the Mustang hitting the front.  The Altima was pushed into a green truck driven by Miguel Robles (Robles) and burst into flames.  The truck was turned 180 degrees.  The Honda hit a red Nissan Sentra driven by Marivel Villagrana (Villagrana), who was in her car parked on Parkway Drive, a few houses north of Elliott Avenue.  Villagrana's Sentra then hit a red Camaro in front of it.

"*The fatalities*

"Los Angeles County Fire Captain Henry Rodriguez responded to the accident scene, where he saw the Altima 'totally involved with fire.'  Black smoke and flames were inside the car, with a burning woman visible in the front seat.  '. . . [V]oices of children screaming' were coming from the back of the car.  The flames and intense heat made it difficult to break the windows and impossible to free the occupants.  When the fire was extinguished, three bodies were found inside the car.  The two in the rear had their arms stretched out as if reaching for each other.  The victims were later identified as Dora, Katherine and Robert.

"[*Canizalez and Morones*] *flee the scene*

After the collision, Canizalez got out of his Mustang, walked to the Honda and helped Morones and a few other men push the Honda into Brookside.  Gilbert Canizalez (Gilbert), Canizalez's brother, lived with his family at Brookside.  At approximately 5:30 p.m., he saw Canizalez running toward their home shaking, with a cut on his arm.  Canizalez first told him that he had been in a fight. When Gilbert said he did not believe his brother, Canizalez told him that he was racing Morones, had just crashed, lost consciousness and woke up when he smelled

4

smoke. Gilbert drove him back to the accident scene to get medical assistance from an ambulance. Gilbert admitted to detectives that Canizalez told him that he and Morones had been drinking beer before the crash.

"El Monte Police Sergeant Richard Williams was the first responder to the accident scene and learned that 'somebody . . . had been pushing one of the cars that was involved in the accident.' He located the car, parked in a space 50 to 75 yards from the entrance to Brookside. He contacted Marvin Morones (Marvin), Morones's brother, and asked him who had been driving the car. Initially, Marvin said that he did not know, but that it belonged to his father. After Sergeant Williams showed the Honda to Marvin, Marvin admitted it belonged to Morones. Morones fled to Mexico but was later deported back to the United States. [¶] . . . [¶]

"*The investigation*

"Irwindale Police Officer John Fraijo, a former mechanic and street racer, testified that he inspected the Honda and Mustang, which was known for being a fast car. The tread wear on the Mustang's driver's side rear tire was consistent with rapid acceleration, and the rims and tires were larger than standard. He was unable to determine if there were any engine modifications due to the extensive front-end and fire damage. The Honda, on the other hand, had been lowered 'by changing out the coil springs,' the diameter of its rims had been changed to lower its height and increase its maneuverability at high speeds, it had an illegally modified air intake system, its catalytic converter had been removed, and there had been 'modification of the headers,' part of the exhaust system. These modifications increased horsepower and speed.

5

"Fontana Police Captain Dave Faulkner, a traffic collision reconstruction expert, reviewed the investigation file, including diagrams, police reports and photographs, went to the scene and took photographs, and inspected the involved cars.  He calculated that the minimum highest potential speed of the Mustang was 77 miles per hour, and could have been as high as 87 miles per hour, and of the Honda was 80 miles per hour, and could have been as high as 86 miles per hour.  Based upon damage to the two vehicles, Captain Faulkner believed that, at some point, they had hit each other.

"In his report, Captain Faulkner stated that the primary collision factor was attributed to the driver of the Mustang because it was 'his impact and his cause that was the direct result of your party's death.'  '[T]he Vehicle Code and the California reporting system that deals with traffic collision requires [*sic*] you to pick the one cause.'  However, he nonetheless opined that both drivers shared the cause of the collision.  It was caused by the running of the stop sign by the two cars and their unsafe speed.  While he believed that the Honda did not hit the Altima, because there was so much damage from the fire to the back and side of the Altima, '[t]here was no way to tell.'" (*People v. Canizalez*, *supra*, 197 Cal.App.4th at pp. 837–840, fns. omitted.)

**The Theories of Liability at Trial**

The prosecutor proceeded on two theories of murder liability:  implied malice and the natural and probable consequences doctrine.  The jury was instructed on both theories.

**Our Decision in *Canizalez***

In *Canizalez*, we rejected the argument that there was insufficient evidence to support the murder convictions for

6

Canizalez and Morones because there was overwhelming evidence of implied malice as well as ample evidence of causation. (*People v. Canizalez*, *supra*, 197 Cal.App.4th at pp. 841–846.) We did not analyze whether there was sufficient evidence to support their convictions under the natural and probable consequences doctrine. (*Id.* at p. 846.)

Moving on, we considered Morones's argument that the trial court committed instructional error when it gave CALCRIM No. 400, the instruction on aiding and abetting, in combination with CALCRIM No. 403, the instruction on the natural and probable consequences doctrine, without telling the jury it could convict him of a less serious offense than that of which the direct perpetrator was convicted. In his view, CALCRIM No. 400 essentially instructed that he should be convicted of the same offense as the direct perpetrator because it stated that an aider and abettor is "'equally guilty'" of the crime committed by the direct perpetrator. (*People v. Canizalez*, *supra*, 197 Cal.App.4th at p. 848.) After determining that Morones had forfeited the objection, we concluded that there was no prejudicial error because there was sufficient evidence that Canizalez and Morones "were guilty of second degree murder as joint, direct perpetrators of the deaths of Dora and her children. As joint perpetrators they were 'equally guilty' of the charged offense." (*People v. Canizalez*, *supra*, at p. 850.)

Next, we stated: "Even if the 'equally guilty' language in the 2009 version of CALCRIM No, 400 was an incorrect statement of the law, we nonetheless conclude that giving it here was harmless under even the most stringent harmless error standard. [Citation.] . . . [T]he evidence that Morones and Canizalez were coparticipants in the speed contest and

7

coperpetrators of the victims' deaths is overwhelming. Captain Faulkner opined that both appellants shared the cause of the collision, which was caused by running the stop sign and speeding. It would be virtually impossible to conclude that either one of the appellants was aiding the other, as they were both full and equal participants in the speed contest that resulted in the fatal accident.

"Similarly, any error in failing to include vehicular manslaughter as a possible nontarget offense in CALCRIM No. 403 was harmless beyond a reasonable doubt. The jury was separately instructed on the elements of the offenses of murder and vehicular manslaughter. On an aider and abettor theory, one of the appellants had to be the direct perpetrator and the other the aider and abettor. The jury found both [defendants] guilty of second degree murder. Hence, if it decided the matter on an aider and abettor theory, it had to have found that the direct perpetrator satisfied the required elements for murder. If the direct perpetrator committed murder, as discussed above, the aider and abettor was "equally guilty" of murder under the natural and probable consequences doctrine. Thus, even if manslaughter was included in CALCRIM No. 403, the aider and abettor would be guilty of murder." (*People v. Canizalez*, *supra*, 197 Cal.App.4th at pp. 852–853.)

**The Section 1170.95 Petition**

On July 28, 2020, Morones filed a petition for resentencing pursuant to section 1170.95. Morones checked boxes stating that: (1) a complaint, information, or indictment had been filed against him that allowed the prosecution to proceed under theories of either felony murder or the natural and probable consequences doctrine, (2) he was convicted of first or second degree murder

8

pursuant to the natural and probable consequences doctrine, (3) he could no longer be convicted of murder pursuant to changes made to sections 188 and 189, and (4) he could no longer be convicted of second degree murder under the felony murder or natural and probable consequences doctrine due to changes to section 188.

Because the sentencing judge was no longer available to rule on the petition, the case was assigned to a different judge. On September 28, 2020, private defense counsel appeared on Morones's behalf and the matter was continued for further proceedings. Following the prosecution's opposition to the petition, defense counsel replied and argued that there was a prima facie case for relief because the jury had been instructed on the natural and probable consequences doctrine, the prosecution relied heavily on that doctrine during closing argument, and Morones was not the actual killer.

At the next hearing, the trial court tentatively ruled that Morones had failed to make "a prima facie showing that he could not have been convicted of second-degree murder because [of] the recent changes to . . . section 188 or 189." It noted that Morones had been convicted of murder and that the appellate court had determined that there was sufficient evidence that Morones was a direct perpetrator who acted with implied malice. The trial court placed "great weight on the appellate court's review on that issue."

After hearing argument, the court denied the petition. It determined that Morones was a direct participant in a speed contest because "there could not have been a speed [contest] without two vehicles[.]" Because Morones was a "direct participant in the speed [contest] that ultimately resulted in the

9

deaths of those victims," there was "sufficient evidence to sustain his conviction under second-degree murder based upon implied malice."  Based on these factual findings, the trial court concluded that Morones had been convicted of implied malice murder.

This appeal followed.

## DISCUSSION

### I.  Standard of Review.

This case is subject to de novo review because it involves the application of law to undisputed facts.  (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1123; *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018.)

### II.  Section 1170.95.

A defendant convicted of murder under a felony murder theory or the natural and probable consequences doctrine can have his or her conviction vacated and be resentenced on a lesser count if he or she could not now be convicted of murder due to the changes to sections 188 and 189 that took effect on January 1, 2019.  (§ 1170.95.)  These changes significantly modified the law related to accomplice liability. (*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1098–1099.)

A principal cannot be convicted of murder unless he or she acted with malice aforethought, except as otherwise specified in section 189.  (§ 188, subd. (a)(3).)

After a defendant seeks relief by filing a petition that satisfies section 1170.95, subdivisions (a) and (b) the trial court "shall review the petition and determine if the petitioner has made a prima facie showing that the [defendant] falls within the provisions of this section.  If the [defendant] has requested counsel, the [trial court] shall appoint counsel to represent the

10

[defendant]. The prosecutor shall file and serve a response within 60 days of service of the petition and the [defendant] may file and serve a reply within 30 days after the prosecutor response is served. . . . If the [defendant] makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).) After the appointment of counsel and an opportunity for briefing, the trial court may consider the record of conviction to determine whether the defendant has made a prima facie showing of eligibility for relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 970 (*Lewis*).) The record of conviction includes trial court and appellate court documents "up to finality of the judgment." (*People v. Woodell* (1998) 17 Cal.4th 448, 455.)

"[W]hen assessing the prima facie showing, the trial court should assume all facts stated in the section 1170.95 petition are true. [Citation.]" (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980 (*Drayton*), overruled on other grounds in *Lewis*, *supra*, 11 Cal.5th at p. 963.) If the record contains facts that refute allegations in the petition, the petition can be denied. But "[t]his authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, [subdivision] (d) is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion[.]" (*Drayton*, *supra,* at p. 980.)

If a trial court issues an order to show cause, it must hold a hearing to determine whether to vacate the murder conviction, recall the sentence, and resentence the defendant on any remaining counts. (§ 1170.95, subd. (d)(1).) At the hearing, the burden of proof is on the prosecution to prove beyond a

11

reasonable doubt that the defendant is ineligible for resentencing. The parties "may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).)

**III. Analysis.**

A review of the record reveals that while there was strong evidence indicating that appellant acted with implied malice due to the danger inherent in his conduct (§ 188, subd. (a)(2) ["circumstances attending the killing show an abandoned and malignant heart"]; *People v. McNally* (2015) 236 Cal.App.4th 1415, 1425 [implied malice requires the performance of an act that is dangerous to life and either knowledge of, or conscious disregard of, that danger]), the record of conviction did not establish as a matter of law that the jury convicted Morones based on an implied malice theory rather than on a natural and probable consequences theory. Based on his petition and the record, Morones made a prima facie showing of eligibility for resentencing and this case must be remanded for an evidentiary hearing conducted pursuant to section 1170.95, subdivision (d)(3).

## DISPOSITION

The order is reversed.  Upon remand, the trial court shall issue an order to show cause and conduct a section 1170.95, subdivision (d)(3) evidentiary hearing.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT

13