Filed 7/14/23  In re Flores CA4/3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re VICTOR MANUEL FLORES<br><br>on Habeas Corpus. | G058938<br><br>(Super. Ct. No. 94CF2726)<br><br>O P I N I O N |

Original proceedings; petition for a writ of habeas corpus.  Granted.  Request for judicial notice.  Granted.

Siri Shetty, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal, Lynne G. McGinnis, and Randall D. Einhorn, Deputy Attorneys General, for Respondent.

Petitioner Victor Manuel Flores petitions for a writ of habeas corpus after a jury convicted him in 1995 of first degree premeditated murder, two counts of attempted willful, premediated and deliberate murder, and two counts of conspiracy to commit assault with force likely to produce great bodily injury, and the jury found true gang and vicarious firearm enhancements on each count. Based on these convictions and findings, the trial court sentenced Flores to prison for 26 years to life for first degree murder and imposed two consecutive life terms for the premeditated attempted murders.[1] This court affirmed the judgment in 1998. (*People v. Millones & Flores* (Sept. 30, 1998, G019380) [nonpub. opn.].)[2]

In 2020, Flores filed the instant petition for a writ of habeas corpus, raising the following claims: (1) his first degree murder conviction should be reversed under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), superseded by statute on another ground, as noted in *People v. Gentile* (2020) 10 Cal.5th 830, 849; and (2) his two convictions for premediated attempted murder should be reversed under *Chiu* and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*) because these convictions were based on the natural and probable consequences theory of liability. We issued an order to show cause, and in an unpublished opinion in 2021, we granted Flores's petition for a writ of habeas corpus. The Attorney General petitioned for review, which the California Supreme Court granted and held pending resolution of *People v. Lopez*, review granted November 13, 2019, S258175 (*Lopez*).[3]

---

[1] As a convenient shorthand, we will refer to Flores's convictions on the attempted willful, premeditated and deliberate murder charges as premeditated attempted murder.

[2] We grant Flores's unopposed request for judicial notice of our records in his prior appeals (case Nos. G019380 and G058216), along with our prior opinion in case No. G019380. (Evid. Code, §§ 452, subd. (d)(1), 459.)

[3] One of the issues before the California Supreme Court in *Lopez* was: "In order to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, must a premeditated attempt to

Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551) (Senate Bill 775) was subsequently enacted and took effect January 1, 2022. Among other things, Senate Bill 775 amended former Penal Code section 1170.95[4] to permit defendants previously convicted of attempted murder under the natural and probable consequences doctrine to petition the superior court for relief from their convictions and for resentencing. (Stats. 2021, ch. 551, § 2.)

The Supreme Court transferred this matter back to us with directions to vacate our prior opinion and reconsider the cause in light of Senate Bill 775. (Cal. Rules of Court, rule 8.528(d).) We received supplemental briefing from Flores and the Attorney General on the new legislation's impact on Flores's petition for a writ of habeas corpus. (*Id.*, rule 8.200(b).) We vacated our prior opinion but stayed resolution of Flores's petition for a writ of habeas corpus pending resolution of petitions he had filed in the superior court pursuant to former section 1170.95, seeking relief on his murder and attempted murder convictions (resentencing petitions).[5]

Over the next several months, we received minute orders from the superior court concerning Flores's resentencing petitions. Eventually, because Flores's resentencing petitions were still pending resolution in the superior court, we dissolved our stay on the instant petition for a writ of habeas corpus.

---

murder have been a natural and probable consequence of the target offense? In other words, should *People v. Favor* (2012) 54 Cal.4th 868 be reconsidered in light of *Alleyne*[*, supra*, 570] U.S. 99 and [*Chiu, supra*,] 59 Cal.4th 155?"

[4] Subsequent statutory references are to the Penal Code unless otherwise stated. Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 without any substantive change. (Stats. 2022, ch. 58, § 10.)

[5] In April 2019, Flores filed a petition to vacate his murder conviction and for resentencing under former section 1170.95. In January 2022, after Senate Bill 775 took effect, Flores filed a new petition to vacate his murder and attempted murder convictions and for resentencing under former section 1170.95.

Flores's convictions for first degree murder and premeditated attempted murder were predicated on the natural and probable consequences doctrine. We agree with the parties Flores's first degree murder conviction must be vacated and remanded for further proceedings based on the Supreme Court's decision in *Chiu, supra*, 59 Cal.4th 155. We also conclude the findings the attempted murders were willful, deliberate, and premeditated must be vacated and remanded for further proceedings. Therefore, we grant Flores's petition for a writ of habeas corpus, vacate his first degree murder conviction, vacate the findings the attempted murders were willful, premeditated and deliberate, and remand for further proceedings.

This habeas corpus proceeding is separate from Flores's resentencing petitions pending in the trial court. (*In re Cobbs* (2019) 41 Cal.App.5th 1073, 1076, 1081 ["Senate Bill 1437 applies retroactively only through its resentencing provision," former section 1170.95, and not through habeas proceedings].) We are not addressing whether Flores's murder and/or attempted murder convictions should be vacated pursuant to former section 1170.95, as those issues are currently pending before the trial court.[6]

FACTS

Flores and his codefendant Marcos Millones were jointly tried by a jury and convicted in 1995. We recite the facts of the underlying crimes by quoting from our opinion in Flores's direct appeal. (*People v. Millones & Flores, supra*, G019380 [nonpub. opn.].)

---

[6] In January 2023, we received a declaration from the deputy district attorney handling the resentencing petitions, stating the parties were "preparing for an Order to Show Cause evidentiary hearing." The minute orders we have received from the trial court do not show an evidentiary hearing has taken place yet, nor do they show the court has issued an order to show cause. The minute orders show the matter has been repeatedly continued for status conferences on the resentencing petitions.

4

I.

TRIAL EVIDENCE

A. *The Attempted Murder of George Fernandez*

"On September 25, 1993, Grant Rowan was socializing with his friends, George Fernandez and Ruben Cantou. Ruben was a member of the 'Compton Barrio' gang (CB)[ ] and accompanied Grant along with Robert and George as they walked through the carport of George's apartment complex. There was a group of six or seven Hispanic men in the carport, one of whom yelled something in Spanish. Someone responded with the word, 'Jeffrey,' short for Jeffrey Street, the name of another criminal gang. Suddenly, Ruben yelled, 'they have a gun!' Grant's group took off for George's apartment, near the door of which stood George, ignorant of the immediately preceding events. The Hispanic men chased Grant's group, yelling 'get 'em; get 'em!' A series of shots rang out, and one bullet hit George in the collarbone. After the spray of gunfire, the Hispanic men fled, their parting refrain being 'puro loco Jeffrey Street!' The responding police officers found numerous shell casings of both .380 and .25 caliber types, two knives, numerous bullet holes and an unspent .380 caliber round." (*People v. Millones & Flores*, *supra*, G019380 [nonpub. opn.].)

B. *The Murder of Teofilo Carlos and Attempted Murder of Joel Carlos in October 1993*

"Teofilo and Joel Carlos were attending a party at the home of their cousin, Tony Carlos, in Anaheim. They were all members of a gang known as 'La Fabrica.' Around midnight, Tony, Teofilo and their friend, Rigoberto Garcia, went to use a clothes hanger through the window of Rigoberto's car to get his keys which were locked inside. As they walked along the street, a car came swerving towards them, the occupants yelling 'big bad travelers; Jeffrey Street!' The car screeched to a halt, and Teofilo was attacked by the occupants, leaving him beaten on the street. When Joel tried to reach him to help,

5

one of the men from the car pulled a large knife on him and began swinging it back and forth. The men jumped back into the car and drove off.

"Teofilo, Tony and Rigoberto were angry; a couple of their friends arrived soon thereafter to discuss what had just transpired. As the five men were talking outside, two cars and a white truck suddenly drove towards them and a yell could be heard, 'big bad Jeffrey Street.' The stillness was shattered by a barrage of shots coming from the vehicles. Joel received two bullet wounds: one in the stomach and one in the forehead that exited through his nose. Teofilo lay dead on the ground nearby, gunshot wounds in both legs and a fatal one to the back of his head. Numerous .380 and .25 caliber bullet casings were found in the area. The bullets retrieved from Teofilo's body were of both .380 and .25 caliber types.

"Soon after the incident, Rigoberto spoke with police officers, telling them he saw two men with guns fire on his friends. Then the people got back into the three vehicles, yelled an obscenity along with 'big bad Jeffrey Street,' and drove away. He then noted Millones' picture in a photographic lineup looked 'like one of the guys at the scene,' along with one, Marco Cisco. He also identified Juan Wezar as one of the shooters, and Javier Godinez as the other one. He failed to identify Flores.

"Police officer Charles Sullivan interviewed defendant Flores soon after the drive-by shooting. Flores stated he was a Jeffrey Street gang member, having the moniker of 'Trigger.' At first, he denied that he knew anything about the two shooting incidents. He admitted, however, that a month before the September clash, he saw a car he recognized as connected to the CB gang. The occupants 'threw hand signs' at him and someone fired a shot, which missed. Such conduct was disrespectful to his gang, and he informed his gang partners of what had happened. The Jeffrey Street gang and the CB were rivals and exchanged gunfire frequently via 'paybacks.' He added that the September shooting could have been a payback for that incident of which he was the brunt.

6

"Later in the conversation, Flores admitted he was involved in the September shooting. He and Millones -- whose nickname was 'Shotgun' -- were trying to park in front of Flores' home when people began throwing bottles at his truck. Someone advanced on him with a knife, and Millones yelled that he saw a gun. Curt statements as to their respective gang affiliations were exchanged, and Flores and Millones screeched away to gather their forces. They collected three partners and returned to the location in two vehicles, a truck and a car. They immediately noticed CB gang members, and both groups started 'throwing hand signs' and exchanging gang names: taunting behavior between gangs. One member of the Jeffrey Street group pulled out a black automatic handgun and started firing. Flores ran back to the truck as he was the getaway driver for the three of them. Flores described the incident as a gang-related shooting.

"Initially, he said he was not present at the October shooting, but that he knew it was a payback for a beating of two Jeffrey Street members by La Fabrica. Later, he talked to another officer and admitted he and Millones were at a party when fellow Jeffrey Street members arrived, telling them that they had just 'thrown blows' with La Fabrica. At that, the whole group piled into two cars and a truck and drove to the location of the clash. Immediately, he leaped from his car and started fighting with some men. Suddenly, gunshots were fired and Flores fled the area. He said his Jeffrey Street friends had guns on them but he did not discover this until their arrival at the scene of the fight. He fled with Millones and another gang member by the name of 'Peewee.'" (*People v. Millones & Flores*, *supra*, G019380 [nonpub. opn.].)

II.

JURY INSTRUCTIONS

When instructing the jury, the trial court explained principals in a crime include both "those who directly and actively commit the act constituting the crime" or "those who aid and abet the commission of the crime." (See CALJIC No. 3.00.) The

7

court defined aiding and abetting as follows: "A person aids and abets the commission of a crime when [he] or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator, and [¶] (2) with the intent or purpose of committing, encouraging or facilitating the commission of the crime, by act or advice, aids, promotes, encourages or instigates the commission of the crime." (See CALJIC No. 3.01.)

The jury was instructed on the natural and probable consequences doctrine as the theory of liability for the murder and attempted murder charges. The court instructed the jury: "One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a princip[al], which is a natural and probable consequence of the crimes originally aided and abetted. [¶] In order to find the defendant guilty of the crimes of murder and attempted murder [a]s charged in counts 1, 2 and 4 and the lesser related crimes, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of assault with [force] likely to cause great bodily injury[,] [¶] Penal Code section 245(a)(1)) or Assault, Penal Code section 240 or Battery, Penal Code section 242, were committed. [¶] 2. The defendant aided and abetted such crimes, [¶] 3. The co-princip[al] in such crime committed the crimes of murder or a lesser related crime thereto, and attempted murder, or a lesser related crime thereto and [¶] 4. The crimes of murder or a lesser related crime thereto and attempted murder or a lesser related crime thereto was a natural and probable consequence of the commission of the crimes of assault with force likely to cause great bodily injury or assault or battery." (See CALJIC No. 3.02.)

The jury was given special instructions on the natural and probable consequences doctrine, as it was understood at the time. The first read: "A natural and probable consequence is defined as a consequence which is reasonably foreseeable. [¶] The aider and abett[o]r or co-conspirator need not intend the ultimate crime be committed, nor need he even personally foresee that it may be committed. It is enough that objectively it is reasonably foreseeable that the ultimate crime may occur." The

8

second special instruction read: "With respect to the foreseeability of the ultimate crime, the issue does not turn on the defendants' subjective state of mind, but depends upon whether under all the circumstances presented, a reasonable person in the defendants' position would have or should have known if the ultimate crime was a reasonably foreseeable consequence of the crime aided or the conspiracies."

The court instructed the jury on the elements of the target crimes of assault with force likely to cause great bodily injury, battery, and simple assault, as well as first and second degree murder, manslaughter, and involuntary manslaughter. (CALJIC Nos. 8.10, 8.11, 8.30, 8.37, 8.40, 8.45.) The court also instructed the jury on attempted murder. (CALJIC No. 8.66.) The instruction on deliberate and premeditated murder told the jury: "To constitute a deliberate and premeditated killing, the *slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill." (CALJIC No. 8.20, italics added.) Similarly, the instruction on attempted willful, deliberate and premeditated murder told the jury: "To constitute willful, deliberate, and premeditated attempt to commit murder, the *would-be slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being." (CALJIC No. 8.67, italics added.)

### III.

### CLOSING ARGUMENT

Neither Flores nor his codefendant was alleged to have been the shooter in the charged offenses. The prosecutor explained this to the jury, telling it: "[T]he prosecution has never advanced a theory that either of these two defendants . . . are the person who directly did the shooting. That is not the theory of prosecution in this case." The prosecutor's theory instead was Flores and Millones aided and abetted or conspired to commit the target offenses of assault with force likely to cause great bodily injury,

9

battery, or simple assault and were guilty of the charged offenses of first degree murder and premeditated attempted murder because the charged offenses were the natural and probable consequences of the target offenses. We provide a sampling of the prosecutor's argument to the jury below.

The prosecutor argued Flores and Millones aided and abetted "throwing blows" with gang members and "one who aids and abets the commission of a crime, is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by a principal . . . committed by whoever the shooters were, . . . which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty of the crime, and in the particular case murder . . . attempted murder, you must be satisfied beyond a reasonable doubt that the crime of assault, assault with intent to commit great bodily injury, or assault, regular assault or . . . battery, were committed, that the defendants aided and abetted that crime, and that one of the people a, co-principal, . . . committed the crime of murder, or attempted murder, and that crime was a natural and probable consequence of the commission of the crime of assault, battery, assault with force likely to produce great bodily injury." "The aider and [abettor] or conspirator need not intend. They don't have to intend for it to happen that the ultimate crime be committed, nor they even personally foresee it. In other words, they don't even have to think it was going to happen. [¶] It is enough that objectively it is reasonably foreseeable that the ultimate crime may occur. . . . [¶] With respect to [the] foreseeability of the ultimate crime, the issue does not turn on the defendants' subjective state of mind, what the defendant was thinking but depends upon whether under all the circumstances presented, in this particular case, and under all those circumstances, would a reasonable person in the defendant[s'] position, would have or should have known that the ultimate crime was a reasonably foreseeable consequence of the crime . . . ." "And then you determine what the shooter was thinking. Was this person as he is firing shots premeditating deliberately killing Teofilo Carlos? Was this person, who was shooting [ ]

10

at [George] Fernandez, attempting to kill him . . . ?  Had he thought about it?  Was it premeditated and deliberate?"


DISCUSSION

I.

FLORES'S FIRST DEGREE MURDER CONVICTION MUST BE REVERSED

Flores argues his first degree murder conviction must be reversed under the California Supreme Court's holding in *People v. Chiu*, *supra*, 59 Cal.4th 155 because the jury was improperly instructed on the natural and probable consequences theory of aiding and abetting and the error was not harmless beyond a reasonable doubt.  The Attorney General agrees, as do we.

"'There are two distinct forms of culpability for aiders and abettors.  "First, an aider and abettor with the necessary mental state is guilty of the intended crime.  Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.'"'  [Citation.]  *Chiu* eliminated the latter form of aiding and abetting for first degree premeditated murder: '[A]n aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine.  Rather, his or her liability for that crime must be based on direct aiding and abetting principles.'  [Citation.]  *Chiu* is retroactive and may be raised, as here, in a petition for writ of habeas corpus.  [Citation.]"  (*In re Lopez* (2023) 14 Cal.5th 562, 579.)

Here, the trial court instructed the jury Flores could be convicted of first degree premeditated murder under the natural and probable consequences doctrine.  The instructions provided to the jury permitted Flores to be convicted of first degree murder based solely on his intent to commit one of the target crimes of assault with force likely to cause great bodily injury, assault, or battery and on a finding the crime of murder was

11

the natural and probable consequence of the target crime. Only the perpetrator, the "slayer" in the words of the instruction, needed to have deliberated and premeditated. The jury was not required to find Flores acted with premeditation and deliberation to convict him of first degree murder. We agree with the parties this was error under *Chiu*.

We also agree with the parties this error was not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) In view of the evidence presented at trial, instructions permitting an erroneous theory of liability, and the prosecutor's argument emphasizing the erroneous theory, it cannot be said beyond a reasonable doubt "any rational jury would surely have rendered the same verdict had it been properly instructed. [Citation.]" (*In re Lopez, supra*, 14 Cal.5th at p. 584; *Chiu*, *supra*, 59 Cal.4th at p. 167 ["first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder"].)

Accordingly, we reverse Flores's first degree murder conviction and remand the matter to the trial court where the prosecution will be allowed to retry the first degree murder charge under a direct aiding and abetting theory or accept a reduction of the conviction to second degree murder. (*Chiu*, *supra*, 59 Cal.4th at p. 168; *In re Cobbs, supra*, 41 Cal.App.5th at p. 1081.)[7]

---

[7] If the prosecution accepts a reduction of the conviction to second degree murder, the trial court must still determine whether Flores is entitled to have his murder conviction vacated and be resentenced under section 1172.6 because Flores's murder conviction remains based on the natural and probable consequences theory under *Chiu, supra*, 59 Cal.4th 155. In this scenario, the trial court must decide whether to issue an order to show cause and if it does, hold a hearing to determine whether to vacate the second degree murder conviction and resentence Flores on any remaining counts. (§ 1172.6, subds. (c), (d)(1).) If the court issues an order to show cause, the prosecution would have the burden of proving beyond a reasonable doubt Flores is guilty of murder under amended section 188. (§ 1172.6, subd. (d)(3).)

12

## II.

### THE FINDINGS THE ATTEMPTED MURDERS WERE DELIBERATE AND PREMEDITATED MUST BE REVERSED

Flores was convicted under the natural and probable consequences doctrine of two counts of attempted murder, and the jury found true the sentencing allegations the attempted murders were premeditated and deliberate. Because the jury found true the premeditation sentencing allegations, the court imposed life terms on the attempted murder convictions. (§ 664, subd. (a).) Had the jury not found the attempted murders were premeditated and deliberate, Flores's punishment for the attempted murders would have been "imprisonment in the state prison for five, seven, or nine years." (*Ibid.*)

In his petition for a writ of habeas corpus, Flores argued the premeditation findings, which subjected him to life terms, must be reversed because they were sustained under the natural and probable consequences doctrine, without a jury finding he shared a premeditated intent to kill or that premeditated attempted murder was a reasonably foreseeable consequence of the target offenses. He asserted the natural and probable consequences theory underlying the premeditation findings was no longer valid under *Chiu, supra*, 59 Cal.4th 155 and *Alleyne, supra*, 570 U.S. 99.

In his petition, Flores acknowledged the California Supreme Court held in *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*) there is no requirement under the natural and probable consequences doctrine "an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense." (*Id.* at p. 880.) In *Favor*, the California Supreme Court held a court need not instruct the jury it must find a *premeditated* attempted murder was a natural and probable consequence of the target offense. (*Id.* at pp. 879–880.) Instead, "with respect to the natural and probable consequences doctrine as applied to the premeditation allegation under section 664(a), attempted murder—not attempted premeditated murder—qualifies as the nontarget *offense* to which the jury must find foreseeability." (*Id.* at p. 879.) *Favor* explained if the jury found the attempted murder was a reasonably foreseeable

13

consequence of the target offense, the jury would then determine whether the direct perpetrator acted with the requisite mental state of deliberation and premeditation; the aider and abettor need not share the direct perpetrator's mental state. (*Id.* at pp. 877–880.) Flores argued *Chiu*, which was decided nearly two years after *Favor*, effectively overruled *Favor* because the two could not be reconciled.

Initially, the Attorney General argued Flores's premeditated attempted murder convictions were proper under *Favor*. But changes in the law after the Attorney General filed his return have changed his position. Senate Bill 775 has eliminated the natural and probable consequences doctrine as a theory to prove an attempted murder. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.) Senate Bill 775 clarified "persons who were convicted of attempted murder or manslaughter under . . . the natural probable consequences doctrine are permitted the same relief [under former section 1170.95] as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1.)

After the California Supreme Court transferred this case back to us to reconsider in light of Senate Bill 775, the Attorney General asserted Flores should file a resentencing petition in the superior court to address his attempted murder convictions, which would necessarily encompass the premeditation sentencing allegations attached to them. Flores did exactly that and we stayed the instant habeas petition pending resolution of his resentencing petitions in the trial court under former section 1170.95. However, Flores's resentencing petitions remain pending in the trial court. Although the trial court may have reason to have not yet proceeded with Flores's resentencing petitions, given the passage of time, we have decided to consider the claims before us in this petition for a writ of habeas corpus.

Because Senate Bill 775 abrogated attempted murder under the natural and probable consequences doctrine, we need not consider the implications of *Chiu, supra*, 59 Cal.4th 155, in the context of attempted murder, meaning we need not resolve whether *Favor* remains good law in light of *Chiu*. Nor are we resolving whether Flores is entitled

14

to relief on his attempted murder convictions under former section 1170.95, a matter currently pending before the trial court.

The issue before this court is whether the sentencing enhancements on Flores's attempted murder convictions—the *premeditation* penalty allegations—must be vacated because Flores was convicted of attempted murder under the natural and probable consequences doctrine. We conclude they must under *Alleyne, supra*, 570 U.S. 99.

In *Alleyne, supra*, 570 U.S. 99, a case decided nearly a year after *Favor*, the United States Supreme Court held the Sixth Amendment to the United States Constitution requires any fact that, by law, increases the mandatory minimum penalty for a crime be treated as an "'element'" of the crime, meaning it must be submitted to the jury and found true beyond a reasonable doubt. (*Alleyne, supra*, 570 U.S. at p. 103.) The holding in *Alleyne* was based on "the original meaning of the Sixth Amendment" and the Supreme Court's earlier decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466, which held any fact, other than the fact of a prior conviction, that increases the maximum penalty for a crime is an element of the offense that a jury must find true beyond a reasonable doubt. (*Apprendi, supra*, at p. 525; *Alleyne, supra*, 570 U.S. at p. 103.) *Alleyne* held a fact increasing the statutory minimum is as much an element that must be proved to the jury beyond a reasonable doubt as a fact increasing the statutory maximum. (*Alleyne*, at pp. 111–112.) In *Alleyne*, the Supreme Court stated, "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." (*Id.* at pp. 114–115.)

Under section 664, subdivision (a), the minimum prison term for attempted murder, absent a finding of deliberation and premeditation, is five years. But when a finding of deliberation and premeditation has been made, the punishment is a life term (*ibid.*), and a defendant must serve a minimum of seven years before he or she can

15

receive parole (§ 3046, subd. (a)(1)). Thus, a finding of deliberation and premeditation increases the minimum penalty for attempted murder.

Under *Alleyne*'s directive, Flores was entitled to have the jury determine whether the *premeditated* attempted murder was a natural and probable consequence of the offenses he aided and abetted. At the time of Flores's trial, "aider and abettor culpability . . . [was] not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.) Thus, the jury needed to decide whether "'"a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."' [Citation.]" (*Chiu, supra*, 59 Cal.4th at p. 162.)

Here, however, the jury was not instructed it had to find the premeditated attempted murder was a natural and probable consequence of the target offenses of assault by force likely to cause great bodily injury, battery, or simple assault. Under the natural and probable consequences theory at the time of Flores's convictions, the jury did not have to find he personally intended to kill, shared the "would-be slayer's" intent, or the premeditated attempted murder was a natural and probable consequence of the target offenses. Thus, the court's instructions deprived Flores of his Sixth Amendment right to a fair trial.

This constitutional violation, like that on his first degree murder conviction, is not harmless beyond a reasonable doubt given the evidence presented at trial and the prosecutor's argument to the jury concerning Flores's culpability for the attempted murders. (*Chapman v. California, supra*, 386 U.S. at p. 24.) Accordingly, we vacate the findings the attempted murders were willful, deliberate, and premeditated. We remand the matter to the trial court to provide the prosecution an opportunity to decide whether to retry Flores on the premeditation penalty allegations with appropriate jury instructions. (Again, we reiterate the trial court must consider whether Flores is entitled to relief for his attempted murder convictions and resentencing under section 1172.6.)

16

DISPOSITION

Flores's petition for a writ of habeas corpus is granted. His first degree murder conviction is vacated, and the matter is remanded to the trial court where the prosecution will be allowed to retry the case and seek a first degree murder conviction under a direct aiding and abetting theory or accept a reduction of the conviction to second degree murder. Flores's two attempted murder convictions are affirmed, but the findings the attempted murders were willful, deliberate, and premeditated are vacated. On remand, the prosecution will have the opportunity to decide whether to retry Flores on the premeditation penalty allegations under a theory consistent with current law. Flores will be resentenced in accordance with the outcomes of those further proceedings.


MOTOIKE, J.

WE CONCUR:


GOETHALS, ACTING P. J.


SANCHEZ, J.

17