Filed 10/2/24  P. v. Allen-Houston CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY ALLEN-HOUSTON,<br><br>    Defendant and Appellant. | B330557<br><br>(Los Angeles County<br>Super. Ct. No. GA109275) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Deborah S. Brazil, Judge.  Affirmed.
        Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.
        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Charles S. Lee, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Anthony Allen-Houston of second degree murder and related crimes after he drove through a red light at 100 miles per hour while talking on his cell phone and crashed his car into another car, killing one person and injuring another. The trial court sentenced Allen-Houston to a prison term of 34 years to life.

Allen-Houston argues the trial court abused its discretion in admitting a toxicology report that showed he had methamphetamine and amphetamine in his system at the time of the crash. He also argues substantial evidence did not support his murder conviction. We conclude that the trial court did not abuse its discretion in admitting the toxicology report and that substantial evidence supported his conviction for implied malice murder. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Allen-Houston Runs a Red Light and Crashes into a Car*

On the evening of December 8, 2020 Juanita Johnson was driving westbound on Glenarm Street on her way back from dining at a restaurant. Johnson's daughter Destiny Huston, Johnson's 20-month-old granddaughter, and another passenger were in the car. Huston was seated directly behind her mother, and the baby was next to Huston. Johnson's car was stopped at a red traffic signal. When the signal turned green, Johnson proceeded to drive into the intersection of Glenarm Street and Fair Oaks Avenue. As Johnson drove through the intersection,

Allen-Houston was speeding down Fair Oaks Avenue in a black car.  Allen-Houston ran the red light at Glenarm and crashed into Johnson's car.

Jasani Oliver was driving south on Fair Oaks Avenue toward the intersection.  She was a block away when she saw the headlights of Allen-Houston's car "coming really fast" northbound on Fair Oaks Avenue.  She heard a crash and felt the ground move, but did not see the accident because a bus was blocking her view.

B.  *Oliver Renders Aid Until Paramedics Arrive*

As Oliver continued driving on Fair Oaks Avenue, she heard a woman crying, "'Help me.  Help me.  Help me and my baby, please.'"  Oliver pulled onto Glenarm and got out of her car.  As she walked toward the intersection, she heard Allen-Houston screaming, "'I need to leave the scene.  I'm a convicted felon. I can't go back to jail.'"  Oliver turned to Allen-Houston, who was sitting in his car with both feet out on the pavement, and recorded his actions on her phone.  As she walked toward Johnson's car, she heard Huston screaming and banging on the back window of the driver's side door saying, "'I'm stuck'" and "'Please help me.'"  Oliver broke the back window with her keys, helped Huston out of the car, and saw one of Huston's knees "was messed up really bad."  Through the broken window, Oliver was able to get the baby out of the car.

As Oliver was holding the baby, Huston ran to help her mother.  Huston administered cardiopulmonary resuscitation, but Johnson did not respond.  Oliver heard Huston say, "'Mom, Mom.'"  Johnson was sitting in an upright position with her seat belt intact.  As Huston struggled to get Johnson out of the car,

3

Johnson fell over. Huston "backed out of the vehicle and panicked and became hysterical." Oliver put the baby down and rushed to help Johnson. As Oliver held Johnson's head, she noticed Johnson's neck and back were broken. Oliver felt Johnson's pulse was faint.

While Oliver was holding Johnson's head, she heard Allen-Houston ask from his car, "'Is she okay? Is she okay?'" Oliver told Allen-Houston that Johnson was dead, and Allen-Houston started yelling and screaming. Oliver asked Allen-Houston how this happened, and Allen-Houston said he had been arguing with his girlfriend. Oliver did not see anyone in the car with Allen-Houston, but she noticed he had a broken cell phone. Oliver also saw Allen-Houston's right ankle was broken and the bone was protruding out of his skin.

Paramedics arrived 15 minutes later, and Oliver let go of Johnson's head. Huston and her daughter were transported to the hospital. Huston suffered a broken ankle, which required surgery and four permanent pins.

C.    *Officers Respond to the Scene, a Nurse Draws Allen-Houston's Blood, and Law Enforcement Obtains Video Surveillance*

Officer Justin Meeks arrived at the scene at 9:30 p.m., by which time all the individuals involved in the accident had been taken to the hospital. Johnson's body, however, was still inside her car, pinned between the driver's door and center console. Officer Meeks observed that Allen-Houston's car had damage consistent with a front-end collision and that Johnson's car had severe side-impact damage. The side airbags, driver's side airbag, and driver's knee airbag in Allen-Houston's car were all

4

deployed. The tire marks from Allen-Houston's car indicated heavy braking. The next morning, Officer Meeks used his motorcycle to conduct a time-distance analysis. He determined Allen-Houston was driving at an average speed of 88.5 miles per hour.

Officer Lynda Mercado, after assisting officers at the scene of the collision, went to the hospital to interview Allen-Houston. She found Allen-Houston receiving medical care in the emergency room. When Officer Mercado asked about the collision, Allen-Houston said he noticed a car tailgating him while he was driving on Fair Oaks Avenue and wanted to get out of the way because his car was new. He did not remember the color of the traffic light. He said he was wearing a seat belt, was not using his cell phone, and had not consumed any alcohol or drugs. Another officer administered a Preliminary Alcohol Screening (PAS) test on Allen-Houston, which showed zero percent blood alcohol content. Officer Mercado asked Allen-Houston if the officers could draw his blood, and Allen-Houston responded by putting his thumb up and presenting his arm. A nurse drew Allen-Houston's blood at approximately 10:55 p.m. and gave the vial to Officer Mercado.

At 10:15 the next morning, Officer Robert Gaudet, who had also responded to the collision the previous evening, returned to the scene to obtain video surveillance. He went to a liquor store on the southwest corner of the intersection and obtained video surveillance of the collision and of Officer Meeks's reenactment of the collision.

5

D.    *A Medical Examiner Conducts an Autopsy on Johnson, and Law Enforcement Generates a Crash Data Report*

A deputy medical examiner from the Los Angeles County Medical Examiner-Coroner's Office conducted an autopsy on Johnson. He explained Johnson suffered abrasions and injuries on her lower hip area from the seatbelt. He concluded her cause of death was an Atlanto-occipital dislocation, which occurred when her cervical spine was dislocated from her skull. He stated the injury caused instantaneous death, although Johnson may initially have had a pulse.

Sergeant Mark Caswell, an officer with the Downey Police Department, assisted the Pasadena Police Department with imaging an airbag control module from Allen-Houston's car and generating a crash data report. The information in the report included pre-crash data about Allen-Houston's car during the five seconds before the moment of impact when the airbags were deployed, including the engine's revolutions per minute, antilock brake system activity, stability control, speed of the car, and steering input. The data showed Allen-Houston turned the steering wheel 82 degrees to the left half a second before the crash. The data also showed that Allen-Houston was traveling at 83 miles per hour five seconds before the crash, accelerated to 100 miles per hour, and decelerated to 63 miles per hour when the crash occurred.

E.    *Officer Meeks Investigates the Accident and Interviews Allen-Houston*

On January 6, 2021 Officer Meeks went to the home of Allen-Houston's grandfather (the police could not reach

6

Allen-Houston through his phone, which had been damaged in the collision). Allen-Houston was not home, but Officer Meeks obtained a phone number for Allen-Houston. The officer called Allen-Houston, and they agreed to meet at the home of Allen-Houston's grandfather on January 12, 2021. Officer Meeks went to the grandfather's house on that date, but Allen-Houston was not there. Allen-Houston said he was running late and asked to meet later in the day. After waiting for more than half an hour, Officer Meeks left.

On March 24, 2021 Officer Meeks interviewed Allen-Houston at the Pasadena Police Department. Allen-Houston said that he thought he was driving 37 miles per hour and that he drove through a red light. Allen-Houston admitted that driving 70 to 80 miles per hour on city streets would be "very unsafe" and "a recipe for disaster."

F.     *Allen-Houston's Toxicology Report Shows 18 Nanograms of Amphetamine and 41 Nanograms of Methamphetamine in His Blood*

Meena Shin, a criminalist with the Los Angeles County Sheriff's Department's Scientific Services Bureau, analyzed Allen-Houston's blood sample with a gas chromatograph. She found 18 nanograms per milliliter of amphetamine and 41 nanograms per milliliter of methamphetamine in the blood sample. She explained both drugs may increase a person's blood pressure, pulse rate, and body temperature and may cause individuals to have dilated pupils, experience decreased appetite, suffer "bruxism" (teeth grinding), have a faster internal clock, and become fidgety. She also stated varying body chemistries affect how an individual reacts to the drugs. Michael Henson, a

7

toxicologist, added that amphetamine is a metabolite of methamphetamine,[1] which meant the drugs may not have been taken separately.  Shin and Henson testified that doctors can prescribe medication that contains methamphetamine for medical reasons, such as treating narcolepsy, gross obesity, or attention deficit disorder, and that the therapeutic level differs across individuals.  Shin stated the therapeutic level for methamphetamine is between 5.5 and 27.5 nanograms per milliliter.  Henson stated the therapeutic level is between 20 and 50 nanograms per milliliter, but could be as high as 100 nanograms.

G.  *A Jury Convicts Allen-Houston, and the Trial Court Sentences Him*

The People charged Allen-Houston with murder (§ 187, subd. (a)),[2] reckless driving causing injury (Veh. Code, §§ 23103, 23105), and vehicular manslaughter with gross negligence (§ 192, subd. (c)(1)).  The jury convicted Allen-Houston on all three counts.

The trial court dismissed one of Allen-Houston's two prior serious or violent felony convictions under the three strikes law (§§ 667, subds. (b)-(j); 1170.12, subds. (a)-(d)) and both prior serious felony convictions (§ 667, subd. (a)(1)).  The court sentenced Allen-Houston to an aggregate prison term of 34 years to life, consisting of 15 years to life, doubled under the

---

[1]  "A metabolite is a 'product of metabolism,' [citation] or . . . 'what a drug breaks down into in the body.'" (*Burrage v. United States* (2014) 571 U.S. 204, 207.)

[2]  Undesignated statutory references are to the Penal Code.

three strikes law, on the murder conviction; and two years, also doubled under the three strikes law, on the reckless driving causing injury conviction.  The court imposed, but stayed under section 654 execution of, a sentence of four years on the manslaughter conviction, doubled under the three strikes law. The court also imposed various fines and fees.  Allen-Houston timely appealed.

## DISCUSSION

A.    *The Trial Court Did Not Abuse Its Discretion in Admitting Allen-Houston's Toxicology Report*

1.    *Applicable Law and Standard of Review*

All relevant evidence is admissible "except as otherwise provided by statute."  (Evid. Code, § 351.)  "'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  [Citation.]  "'The test of relevance is whether the evidence tends, "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'"'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 408.)

Under Evidence Code 352 the trial court in its discretion may "'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Johnson* (2022) 12 Cal.5th 544, 610.)  "'Prejudice' in the context of Evidence Code section 352 is not synonymous with 'damaging': it refers to evidence that

9

poses an intolerable risk to the fairness of the proceedings or reliability of the outcome." (*People v. Booker* (2011) 51 Cal.4th 141, 188.) "'"'[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'"'" (*Johnson*, at p. 610.) "'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice."'" (*People v. Nieves* (2021) 11 Cal.5th 404, 445, brackets in original.)

> 2. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence Allen-Houston Had Drugs in His System*

Prior to trial, Allen-Houston moved to exclude the toxicology report, asserting there was no evidentiary link between the evidence of methamphetamine in his blood and the possibility that it somehow affected his driving. The trial court denied the motion, ruling the "question of whether or not the so-called therapeutic levels of the methamphetamine and amphetamine impacted in any way his motor skills or ability to adequately handle the vehicle" was "a question of fact for the jury, based on expert testimony and/or argument by counsel." The trial court did not abuse its discretion.

10

Allen-Houston does not dispute that, in general, the presence of drugs or alcohol in a defendant's blood is relevant to whether the defendant was impaired while driving a car. He argues the trial court abused its discretion by admitting the blood test evidence in this case because, while the expert witnesses gave "generic testimony about the signs and symptoms of methamphetamine," no witness said Allen-Houston exhibited signs of methamphetamine impairment.

Evidence of the blood test results, however, was relevant, even though the People did not charge Allen-Houston with driving under the influence of alcohol or drugs. On the charge of vehicular manslaughter with gross negligence, the People had to prove Allen-Houston acted with "so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*People v. Watson* (1981) 30 Cal.3d 290, 296; see *People v. Ochoa* (1993) 6 Cal.4th 1199, 1205 [although the test for gross negligence is an objective one, evidence the defendant appreciated the risks of his actions is relevant and admissible].) And evidence of drug or alcohol use before driving may reflect a defendant's awareness of risk, even if the defendant is not charged with driving while intoxicated. (See *People v. Ho* (2018) 26 Cal.App.5th 408 (*Ho*).)

For example, in *Ho* the trial court admitted evidence the defendant, who was charged with vehicular manslaughter with gross negligence, consumed alcohol and drugs the night before the accident. The court held the evidence was "'extremely relevant'" to show the defendant acted with gross negligence, even though the police officer at the scene did not observe any signs of intoxication and 95 minutes after the collision there was no alcohol registered in her system. The court in *Ho* affirmed the

11

defendant's conviction because the totality of the circumstances (including evidence the defendant had been up all night at a party, had taken several different kinds of drugs and consumed alcohol the night before the accident, had not slept, and was late for work) showed the defendant acted with gross negligence. (*Ho, supra*, 26 Cal.App.5th at pp. 414-415.) Thus, the defendant's use of drugs or alcohol before a car accident is relevant if it reflects the defendant's subjective awareness (and disregard) of risk, even if the level of alcohol or drugs in the defendant's system does not exceed the legal limit or demonstrate intoxication. (See also *People v. Canizalez* (2011) 197 Cal.App.4th 832, 842-843 [although the defendants were not charged with driving under the influence, they were charged with implied malice murder, and evidence they consumed beer prior to the accident was relevant to whether they were aware of a high degree of risk].)

Allen-Houston also argues that, even if the blood test results were relevant, the court should have excluded them under Evidence Code section 352 because the undue prejudicial effect of the evidence substantially outweighed its probative value. The court did not abuse its discretion. Other evidence substantially mitigated any prejudicial impact of the blood test evidence. Both toxicology experts testified that a physician may prescribe drugs containing methamphetamine to treat medical conditions such as attention deficit disorder. There was also evidence the level of methamphetamine in Allen-Houston's blood (41 nanograms/milliliter) was well within the defense expert's therapeutic range (25 to 100 nanograms/milliliter) and was not far outside the prosecution expert's therapeutic range (5.5 to 27.5 nanograms/milliliter). (See, e.g., *Ho, supra,* 26 Cal.App.5th

12

at p. 416 [prejudicial effect of evidence of past heroin addiction was mitigated by evidence that the defendant was undergoing treatment for addiction and that no heroin was detected in her blood after the accident].)  And the prosecutor mentioned the blood test evidence once during closing argument, commenting (after stating Allen-Houston sped through a red light) that "whether it was just his energy or the methamphetamine, it's all part of the package."

### B.     *Substantial Evidence Supported Allen-Houston's Conviction for Second Degree Murder*

#### 1.     *Applicable Law and Standard of Review*

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice "may be express or implied."  (§ 188, subd. (a).)  "'[I]mplied malice [has] "both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.'  [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.""'"  (*People v. Soto* (2018) 4 Cal.5th 968, 974.)  "'Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed."  The state of mind of the person who acts with conscious indifference to the consequences is simply, "I don't care what happens.""'"  (*People v. Suazo* (2023) 95 Cal.App.5th 681, 691-692.)  "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more,

13

and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143; accord, *People v. Saucedo* (2023) 90 Cal.App.5th 505, 512 (*Saucedo*).)

In determining whether substantial evidence supports a conviction, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Flinner* (2020) 10 Cal.5th 686, 748; *People v. Murphy* (2022) 80 Cal.App.5th 713, 725.) We review the entire record to determine whether there is evidence that is reasonable, credible, and of solid value to support the verdict. (*Flinner*, at p. 748; *Murphy*, at p. 725.) We do not reweigh evidence or second-guess the jury's credibility determinations. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) Instead, we presume the existence of every fact the jury reasonably could have deduced from the evidence in support of the judgment. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) If the evidence reasonably justified the jury's findings, "'a reviewing court's conclusion [that] the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.'" (*People v. Tran* (2022) 13 Cal.5th 1169, 1204, brackets in original.) Consequently, a "'reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*Murphy*, at p. 725.)

2.      *Substantial Evidence Supported the Jury's
Finding of Implied Malice*

Allen-Houston argues substantial evidence did not support the jury's findings on either the physical or mental components of

14

implied malice murder. There was substantial evidence, however, Allen-Houston deliberately committed an act, the natural consequences of which were dangerous to life; knew the act was dangerous to life; and consciously disregarded that danger. (See *People v. Watson, supra*, 30 Cal.3d at p. 300.)

Substantial evidence supported the jury's finding Allen-Houston's conduct was dangerous to life. Five seconds before the accident, Allen-Houston accelerated toward the intersection and reached a top speed of 100 miles per hour on a street with a posted speed limit of 35 miles per hour. Although Allen-Houston stopped accelerating two seconds before the accident, he entered the intersection traveling at over 88 miles per hour—and against a red light. And there was evidence from which the jury reasonably could have inferred Allen-Houston was talking on his cell phone while driving. The jury reasonably could have concluded Allen-Houston's excessive speed, coupled with his failure to stop at the red light and talking on his cell phone, created a high probability of death for the occupants of any vehicle in the intersection. (See, e.g., *People v. Moore* (2010) 187 Cal.App.4th 937, 941 [defendant's speed of 70 miles per hour in a 35 mile-per-hour zone and failure to stop at a red light "went well beyond gross negligence"].)

Allen-Houston argues "[t]here was no evidence that [he] drove at high speed for a lengthy period of time, making a high-speed accident almost inevitable." But implied malice does not require that the defendant speed for a long time. (See *Saucedo, supra*, 90 Cal.App.5th at p. 514 ["the tragic circumstance that [the defendant] almost immediately collided with another motorist does not preclude a finding that [his] driving immediately prior to the collision demonstrated implied malice"].)

It was enough that Allen-Houston, while driving through a red light and talking on a cell phone, drove at a dangerously high speed when he went through the intersection.

Substantial evidence also supported the jury's finding Allen-Houston acted with a conscious disregard for human life. Allen-Houston knew driving 70 to 80 miles per hour on city streets was extremely dangerous. Yet Allen-Houston was driving 100 miles per hour—nearly three times the posted speed limit— a few seconds before the collision. After the accident, Allen-Houston immediately said he wanted to flee the scene, saying he was a convicted felon and could not go back to jail. (See *People v. Williams* (2013) 56 Cal.4th 630, 679 [evidence of the defendant's flight after committing crimes "supports an inference of consciousness of guilt"]; *People v. Paysinger* (2009) 174 Cal.App.4th 26, 31-32 [flight "is significant because it may reflect consciousness of guilt, which in turn tends to support a finding of guilt"]; *People v. Kessler* (1968) 257 Cal.App.2d 812, 813 ["for the purpose of drawing the inference of consciousness of guilt, the jury may consider not only acts of successful flight but also acts constituting attempted flight"].) Although Allen-Houston remained at the scene (presumably because his leg was broken and his car was not drivable), the jury reasonably could have inferred Allen-Houston was aware of the extreme dangerousness of his conduct because he was concerned about possible criminal prosecution. (See *People v. Navarro* (2021) 12 Cal.5th 285, 339 [""Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.""].) And, as discussed, Allen-Houston's blood test results showed he ingested methamphetamine (and possibly also amphetamine) prior to the accident, a fact he denied when

16

questioned by an investigating officer at the hospital.  The jury reasonably could have inferred Allen-Houston was aware methamphetamine could (or did) affect his driving ability, but drove anyway.  (See *Saucedo*, *supra*, 90 Cal.App.5th at p. 514 ["just because the evidence did not show that appellant had a high level of impairment does not mean that his intoxication [from methamphetamine] had no effect on his driving or decisionmaking"].)  Substantial evidence supported Allen-Houston's conviction for second degree implied malice murder.

## DISPOSITION

The judgment is affirmed.


SEGAL, J.


We concur:


MARTINEZ, P. J.


STONE, J.


17